**BANNER INDUSTRIES, INC.,**
**Plaintiff/Counterdefendant,**

v.

**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and its present Trustees in their capacity as Trustees, Defendants/Counterclaimants,**

and

**Pepsico, Inc., et al., Defendants.**

No. 86 C 3046.

United States District Court, N.D. Illinois, E.D.

March 25, 1987.

Roger L. Taylor, Kirkland & Ellis, Carl L. Taylor, Thomas D. Yannucci, Kenneth N. Bass, Kirkland & Ellis, Washington, D.C., for plaintiff/counterdefendant.

Neil Quinn, Richard Waris, Mary Anne Caproon, Pretzel & Stouffer, Chtd., Chicago, Ill., Deborah Fabricant, Stanley J. Adelman, Rudnick & Wolfe, Richard S. Huszagh, Edward J. Calihan, Jr., Chicago, Ill.,

Thomas C. Nyhan, Stanley J. Brown, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for defendants.

John R. Climaco, John Masters, John A. Peca, Jr., Thomas L. Colaluca, Climaco, Climaco, Seminatore, Lefkowitz & Garofoli, Cleveland, Ohio, for former trustees.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

Banner Industries, Inc. ("Banner") brought this action against, among others, Central States, Southeast and Southwest Areas Pension Fund ("Central States"), seeking a declaratory judgment that Banner is not liable to Central States for any portion of a demand for withdrawal liability[1] in the amount of $19,808,781.43 made against Banner by Central States pursuant to § 4202 of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1382. The dispute currently before this court requires us to review Count I of the complaint, in which Banner claims that it is not an "employer" under the statute and thus not liable for the withdrawal liability assessed against it. Three fully-briefed motions are ready for ruling: (1) Central States' motion to dismiss or, in the alternative, for summary judgment on Count I; (2) Banner's cross-motion for summary judgment on that count; and (3) Central States' motion for summary judgment on its counterclaim for interim payments. We have jurisdiction pursuant to § 4301 of MPPAA, 29 U.S.C. § 1451, and 28 U.S.C. § 1331. For the reasons set forth below, Central States' motion to dismiss Count I is granted, and this case is referred to arbitration; Banner's cross-motion for summary judgment is denied; and Central States'

motion for summary judgment on its claim for interim payments is granted.

### Facts[2]

Prior to March 1983, Banner had a wholly-owned subsidiary, Commercial Lovelace Motor Freight, Inc. ("Commercial"), which was in the business of interstate trucking. Most of Commercial's hourly employees were represented by the International Brotherhood of Teamsters ("Teamsters"), and, pursuant to collective bargaining agreements with the Teamsters, Commercial contributed to various multiemployer pension plans, including Central States.

In March 1983, allegedly in an effort to reverse operating losses suffered by Commercial, Banner established an employee stock ownership plan ("ESOP") and transferred 50.01% of Commercial's stock (4,001,000 shares) to the ESOP. Thus, in March 1983, Banner no longer retained majority control of Commercial. Commercial continued to make payments to Central States under collective bargaining agreements with the Teamsters for two years following the implementation of the ESOP.

Between July 1983 and June 1985, Banner sold its remaining stock in Commercial. In July 1983, Banner sold 790,000 of its shares to CL Investors, a partnership consisting of certain Commercial officers and directors, thereby reducing its ownership in Commercial to approximately 40%. In February 1985, Banner sold another 400,000 of its shares of Commercial to Gerald W. McIntyre, president of Commercial, and in June 1985, Banner sold all of its remaining 2,809,000 shares of Commercial to McIntyre. In March 1985, Commercial ceased all operations and, as a result, ceased to

---

**1.** "Withdrawal liability" refers to an amount owed to a pension plan by an employer which terminates or reduces its contributions to the plan. The withdrawal liability is the amount determined to be the allocable amount of unfunded vested benefits at the time of the employer's withdrawal, subject to certain adjustments. *See* 29 U.S.C. §§ 1381, 1391 and discussion *infra* at 877–79.

**2.** For purposes of a motion to dismiss, we accept the plaintiff's well-pleaded allegations as

true and view them, together with the reasonable inferences to be drawn therefrom, in the light most favorable to the plaintiff. *Powe v. City of Chicago,* 664 F.2d 639, 642 (7th Cir.1981). The facts in this case are largely undisputed. It is the application of the law to the facts that is strenuously contested, as is reflected in the parties' oversized briefs as well as in their numerous submissions of and argument over additional authority in support of their respective claims.

make contributions to Central States on behalf of its employees.

Central States now demands payment by Banner of liability assessed under the withdrawal provisions of MPPAA as a result of Commercial's cessation of operations in 1985. Banner opposes that assessment of withdrawal liability on the ground that it was not an "employer" within the meaning of MPPAA when Commercial withdrew because Banner had sold its controlling interest in Commercial two years before and, accordingly, ceased to have any obligation for Commercial's withdrawal liability. Central States, on the other hand, argues that Banner was unquestionably an employer before March 1983; consequently, any dispute about its withdrawal liability must be brought before an arbitrator, not this court. Central States further urges, however, that the time granted by the statute in which to initiate arbitration has long since expired, and that Central States is thus entitled to judgment for the full $19,-808,781.43. In the event this court finds that Banner has not waived its right to contest its withdrawal liability in arbitration, Central States nonetheless argues that it is entitled to interim payments during the pendency of the dispute. Our analysis necessarily begins with an examination of the statute.

*Discussion*

I. *MPPAA*

Congress enacted The Employee Retirement Income Security Act ("ERISA") in 1974 in an effort to ensure that employees who have been promised certain benefits upon their retirement actually receive those benefits. *See Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 375, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980). In 1980, Congress amended the statute, 29 U.S.C. § 1381 *et seq.*, to deal with the special problems that arise when individual employers terminate their participation in, or withdraw from, multiemployer plans. *See Pension Benefit Guaranty*

*Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). Thus, as explained in the Supreme Court's decision in *Gray:*

A key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue.

467 U.S. at 723 n. 2, 104 S.Ct. at 2714 n. 2 (quoting *Pension Plan Termination Issues: Hearings before the Subcomm. on Oversight of the House Comm. on Ways and Means*, 95th Cong., 2d Sess. 22 (1978) (statement of Matthew M. Lind, Executive Director of the PBGC)).

Congress' enactment of MPPAA corrects this deficiency in the statutory scheme by mandating that an employer who either completely terminates or partially reduces its contributions to a multiemployer pension fund pay a proportionate share of the plan's unfunded vested benefit liability at the time of the employer's termination or reduction of contributions. This termination or reduction of contributions by the employer is referred to in the statute as a complete or partial "withdrawal" from the plan. *See* § 1381. An employer completely withdraws from a multiemployer plan when it either "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." § 1383.[3] In the event of a withdrawal from a multiemployer plan, the plan sponsor determines

---

**3.** Because the parties agree that if any withdrawal occurred, it was a complete withdrawal, we need not consider those provisions dealing with "partial" withdrawals, e.g., §§ 1385, 1386, 1388.

the amount of the employer's withdrawal liability in accordance with § 1381 and § 1391, notifies the employer of the amount of the withdrawal liability, and collects that amount from the employer. *See* § 1382.

Several other provisions of MPPAA, however, provide protection against a withdrawal liability assessment to employers who otherwise cease to have an obligation to contribute or cease all covered operations under the plan. For example, Congress specifically provided that, assuming certain stringent conditions are met, a complete or partial withdrawal does *not* occur "solely because, as a result of a bona fide, arm's-length sale of assets to an unrelated party ..., the seller ceases covered operations or ceases to have an obligation to contribute for such operations." § 1384. Similarly, under § 1398(1), upon which Banner relies in this case, "an employer shall not be considered to have withdrawn from a plan solely because ... an employer ceases to exist by reason of ... a change in corporate structure described in section 1362(d) of this title ... if the change causes no interruption in employer contributions or obligations to contribute under the plan." Under § 1398(2) (upon which Banner does *not* rely), an employer shall not be considered to have withdrawn from a plan solely because the employer suspends contributions under the plan during a labor dispute involving its employees. Notwithstanding these provisions which protect an employer, however, Congress also provided in § 1392(c) that "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction."

The statute further provides an explicit procedure by which an employer may dispute a determination that it should be assessed withdrawal liability. Under § 1399(b)(1)(A), (B), a plan sponsor is obligated "[a]s soon as practicable after an employer's complete or partial withdrawal" to (1) notify the employer of the amount of the liability and the schedule for liability payments, and (2) demand payment in ac-

cordance with the schedule. Section 1399(b)(2)(A) then provides:

No later than 90 days after the employer receives the notice described in paragraph (1), the employer—

(i) may ask the plan sponsor to review any specific matter relating to the determination of the employer's liability and the schedule of payments,

(ii) may identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the employer, and

(iii) may furnish any additional relevant information to the plan sponsor.

The plan sponsor must then notify the employer of the plan sponsor's decision, the basis for the decision, and the reason for any change in the determination of the employer's liability or schedule of liability payments. § 1399(b)(2)(B).

Under § 1401(a)(1), a section crucial to Central States' motion to dismiss, "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." Further, under § 1401(b)(1), "[i]f no arbitration proceeding has been initiated pursuant to subsection (a) of this section, the amounts demanded by the plan sponsor under section 1399(b)(1) of this title shall be due and owing on the schedule set forth by the plan sponsor." Finally, under § 1399(c)(2), "[w]ithdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor ... beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule." Likewise, under § 1401(d), where resolution of a dispute calls for arbitration,

Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision

of the arbitrator with respect to the determination.

With this statutory framework in mind, we turn to the dispute before us.

## II. *Central States' Motion to Dismiss or for Summary Judgment*

Central States has moved to dismiss Count I on the ground that, whatever the merits of Banner's arguments regarding its withdrawal liability, the statute requires that those arguments be brought before an arbitrator for resolution. Banner, on the other hand, argues that only an "employer" is required to arbitrate and that the uncontroverted facts before the court demonstrate that it was not an "employer" in 1985. Banner thus concludes that this court is the appropriate forum in which to dispute its withdrawal liability.

The difficulty in deciding this threshold question, i.e., which tribunal should hear this matter on the merits, arises largely as a result of the parties' failure to agree on what is really at issue. This failure, in turn, is a result of the parties' disagreement as to the legal effect of the implementation of the ESOP. Banner argues that it plainly ceased to be an "employer" for purposes of MPPAA liability in 1983 when the ESOP was established. Banner concedes that prior to March 1983, Banner was an MPPAA "employer" by virtue of § 1301(b)(1), which provides, in relevant part:

> For purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or businesses ... which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26.

The applicable provision of Title 26 provides in essence that a parent corporation that controls 80% or more of the voting stock of a subsidiary is considered to be a single employer with the subsidiary. 26 U.S.C. § 1563(a)(1).[4] Thus, Banner admits that it could be held liable for Commercial's withdrawal prior to March 1983 since at that time it owned 100% of Commercial's stock. *See* Banner's Br., Aug. 6, 1986, at 15–16. Banner takes the position, however, that its "employer" status terminated in March 1983 when Banner transferred its majority control of Commercial to the ESOP. At that point Banner ceased to be "under common control" with Commercial and thus ceased to be a single employer with Commercial for purposes of MPPAA liability. Banner therefore concludes that it cannot be held liable for Commercial's withdrawal in 1985. In any event, Banner argues, the issue to be decided is Banner's "employer" status, and that issue is one that the court must decide because the statute's mandatory arbitration provision applies only to "dispute[s] between *an employer* and the plan sponsor." § 1401(a)(1) (emphasis added). Banner insists that this court must first decide whether Banner is an employer before Banner can be compelled to arbitrate. Banner urges that the "employer" issue is an appropriate one for the court to address in any case because it involves a question of pure statutory construction.

Central States takes a much different view of the effect of Banner's actions for purposes of MPPAA liability. First, Central States denies that the issue for this court is whether or not Banner is an "employer" for purposes of assessing withdrawal liability. Central States points out that Banner *agrees* that until March 1983 it was an "employer" as that term is defined in the statute. Thus, Central States concludes, Banner's "employer" status is not open to dispute. Rather, the issue is

---

**4.** Title 26 U.S.C. § 414(c), referred to in § 1301, provides that corporations which are under common control shall be treated as single employers and provides that "[t]he regulations prescribed under this subsection shall be based on principles similar to the principles which apply in the case of subsection (b)." Subsection (b), in turn, defines a controlled group of corporations as being within the meaning of § 1563(a). Therefore, the provisions of § 1563(a) apply to "control group" withdrawal liability.

whether Banner is exempt from withdrawal liability following the implementation of the ESOP because of § 1398(1). Central States takes the position that the ESOP did not meet all the requirements of § 1398(1),[5] and Banner was properly assessed for withdrawal liability. In the alternative, Central States argues that the issue is whether a principal purpose of the ESOP transaction was to "evade or avoid" withdrawal liability. If so, the plan may, under § 1392(c), assess and collect the withdrawal liability without regard to the ESOP transaction. Central States maintains that resolution of either of these two issues—the applicability of the § 1398(1) exemption or the § 1392(c) "evade or avoid" question—in Central States' favor entitles Central States to assess withdrawal liability against Banner. Central States insists that these issues are the type expressly left to arbitration under § 1401(a)(1), which provides that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan *concerning a determination made under sections 1381 through 1399* of this title shall be resolved through arbitration." (emphasis added).

The parties have supplied the court with a plethora of citations to authority in support of their respective positions. The case most closely resembling ours is *Flying Tiger Line, Inc. v. Central States, Southwest and Southeast Areas Pension Fund*, No. 86–304 CMW, —— F.Supp. —— (D.Del. Oct. 17, 1986), *leave to appeal granted*, No. 86–8060 (3d Cir. Dec. 31, 1986). The plaintiffs in *Flying Tiger*, Tiger International, Inc. and its subsidiaries ("Tiger"), in January 1980 owned 100% of the stock of Hall's Motor Transit Co. ("Hall's"), a large interstate trucking company. Pursuant to collective bargaining agreements with most of its hourly employees, Hall's contributed to a number of multiemployer pension plans, including the defendants.

After Hall's lost substantial amounts of money over several years, Tiger in January 1985 sold 75% of its Hall's stock to Hall's

Acquisition Corp. ("HAC"). HAC agreed to cause Hall's to continue to make payments to the various multiemployer pension plans. Hall's continued to make the required contributions until it filed for reorganization in March 1986. The defendants sought to hold Tiger liable for Hall's withdrawal, and Tiger brought an action seeking a declaratory judgment that it was not liable to the defendants under MPPAA, arguing in count I that Tiger was not an "employer" for purposes of MPPAA and therefore was not subject to the MPPAA's procedures.

The district court in *Flying Tiger*, like this court, was faced with some difficulty in defining the issue to be decided:

The parties' major dispute concerns what needs to be decided to dispose of Count I. Plaintiffs contend that the issue to be decided is whether or not Tiger was an "employer" when Hall's withdrew. The arbitration provision of the MPPAA states that "Any dispute between an *employer* and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title should be resolved through arbitration." 29 U.S.C. § 1401(a)(1) [emphasis added]. Because the arbitration only applies to employers, Tiger argues, a court must first determine whether, as a matter of law, Tiger is an employer before an arbitrator has power to resolve a dispute.

The Funds, however, view the issue raised in Count I differently. To them, the real issue that needs to be decided concerns the January 1985 transaction in which Tiger sold 75% of Hall's to Hall's Acquisition Corp. ("HAC").... The Funds argue that this was a sham transaction whose purpose was to avoid the withdrawal liability.... Under 29 U.S.C. § 1392(c): "If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined

---

5. Specifically, Central States maintains that the ESOP transaction caused Commercial to withdraw; therefore, the change in corporate structure did not meet the requirement that it

"cause[ ] no interruption in employer contributions or obligations to contribute under the plan."

and collected) without regard to such transaction." Significantly, any dispute arising under § 1392 is subject to the arbitration procedures. Therefore, the Funds argue, the issue to be decided belongs before an arbitrator not before the Court.

*Flying Tiger*, at ————— (citations omitted).

The court in *Flying Tiger* agreed with the pension funds. Noting what the judge perceived to be an inherent conflict in the statute, the court nonetheless found that the pension fund had the better argument, reasoning:

> Prior to the 1985 transaction, Tiger owned 100% of Hall's; therefore, Tiger was undisputably in the "employer" control group of Hall's until the transaction. If that transaction is proven to be one subject to 29 U.S.C. § 1392(c), then the Funds are free to ignore the transaction and assert liability against Tiger. If the transaction is held to be an "evade or avoid" transaction, then Tiger was an "employer" on the date Hall's withdrew. But characterizing the issue to be decided as whether or not Tiger was an "employer" is a broad brush description of a specific issue. The case really turns on the determination of the "evade or avoid" question, a question properly before the arbitrator.

*Id.* at ————. In the *Flying Tiger* court's view, the inherent conflict in the statute was that on the one hand the arbitrator is only to resolve disputes between employers and pension funds while on the other hand, the arbitrator must resolve the "evade or avoid" issue. The court was unable to envision a situation in which the "evade or avoid" situation would arise except when the entity from whom payments are sought no longer owns the entity that actually withdrew. Thus, the court concluded that if the arbitrator were only free to decide issues involving an undisputed employer, Congress would not have empowered the arbitrator to decide § 1392(c) disputes. *See id.* at ————.

To the extent the *Flying Tiger* court took the view that all disputes arising un-

der § 1392(c) would necessarily encompass an "employer" issue, we respectfully disagree. In certain matters involving § 1392(c), an employer's status will be beyond question. For example, it is possible that an undisputed employer might fabricate a labor dispute with its employees in order to suspend its contributions to the pension fund without incurring withdrawal liability under § 1398(2). In this situation, the pension fund might well seek to assess withdrawal liability against the undisputed employer under § 1392(c).

█ In spite of our disagreement with the *Flying Tiger* court's view that § 1392(c) issues must be synonymous with "employer" issues, we nevertheless agree with that court that the appropriate forum for resolution of these disputes is arbitration. We begin with the same fundamental premise as the *Flying Tiger* court, i.e., until the date of the transaction in question, Banner was, and admits that it was, an "employer" under § 1301. As a result, contrary to Banner's contention, we do not have an issue of statutory construction, and Banner's citations to cases upholding the proposition that the "employer" determination is a statutory issue for the courts are thus inapposite. In each of those cases, the court was required to interpret the statute in order to decide whether the entity at risk had *ever* been an "employer" as defined by the statute when the withdrawal occurred. *See, e.g., IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 123–24 (3d Cir.1986) (court required to determine whether interest in stock was an option, and, if so, whether resulting constructive ownership rendered corporation as having "controlled group status" under ERISA); *Paperworks Pension Plan v. Arlington Sample Book Co.*, 5 E.B.C. 1948 (E.D.Pa.1984) (whether president and sole shareholder of undisputed employer was himself an "employer" under ERISA); *Baldwin v. Shopmen's Ironworkers Pension Trust*, 3 E.B.C. 1713 (C.D.Cal.1982) (whether two sole shareholders were "employers").

The issue presented by Banner, by contrast, is not whether Banner is an "employ-

er" as defined by the statute, but rather whether Banner at some point *ceased* to be an employer by ceasing to possess those characteristics which caused it to be deemed an employer—in this case, by divesting itself of a majority of its ownership interest in Commercial in March 1983. There exists in the statute no provision indicating the circumstances under which, as a matter of law, an employer ceases to be an employer and because of that fact alone ceases to be responsible for withdrawal liability. On the contrary, the statutory scheme specifically provides that once an entity is an employer, it will be deemed to have withdrawn when it "permanently ceases to have an obligation to contribute under the plan," § 1383, and will be liable for withdrawal liability, § 1381, unless that *employer* finds a statutory safe-haven. Whether the requirements of this safe-haven have been satisfied necessarily turns on the facts of each case. Put another way, the issue of whether one remains an employer on the date of a withdrawal is not the same issue as whether one ever became an "employer" for purposes of ERISA generally and MPPAA in particular. The latter is an issue for the court since its resolution determines the arbitrator's authority over the dispute.[6] The former is an issue for the arbitrator since its resolution turns on the applicability of MPPAA provisions relating to employer withdrawals—provisions Congress specifically placed within the purview of the arbitrator. Banner attempts to bring itself within the latter issue; however, we are persuaded that the issue is really the former. Neither Banner nor Central States disputes that the statute was intended to cover Banner's relationship with Commercial; the dispute is over whether that relationship still existed on the date of Commercial's withdrawal. The determination of this issue, we reiterate, turns on the factual findings relating to the circumstances surrounding the ESOP transaction, and not on any questions of statutory interpretation.[7]

Banner argues that the arbitrator's authority over a dispute cannot turn on the presence or absence of factual disputes, and that it would be erroneous to refer the case to arbitration simply because factual determinations may be required. Banner contends that any factual issues are subsumed in the larger issue of its "employer" status. Thus, Banner argues, in the event the factual determinations establish either that Banner "caused" the interruption in contributions from Commercial in 1985 (and thereby failed to meet the requirements of § 1398(1)) or that a principal purpose of

---

**6.** Central States apparently takes the position that even this issue should be resolved by the arbitrator. *See* Central States' Br., Sept. 18, 1986, at 41 n. 40. *But see Association of Flight Attendants v. Republic Airlines, Inc.,* 797 F.2d 352, 357 (7th Cir.1986) ("It is certainly true that even where it is the arbitrator's task to resolve the merits of a dispute it remains the court's duty to determine the scope of the arbitrator's jurisdiction").

**7.** Banner refers the court to *Central Transport, Inc. v. Central States, Southeast and Southwest Areas Pension Fund,* 639 F.Supp. 788, *subsequent opinion,* 640 F.Supp. 56 (E.D.Tenn.1986) for the proposition that an entity which was not a control group parent on the date of the subsidiary's withdrawal could not be held liable for the withdrawal. Banner's reliance on *Central Transport* is misplaced. Central Transport had entered into an agreement to purchase Mason & Dixon Lines, Inc., the parent of Tank Lines. This agreement, however, was subject to approval by the ICC. Before the approval was given, Tank Lines withdrew from the plan. The ICC *subsequently* gave its approval and the agreement was, in fact, consummated. The court held that Central Transport was not liable for the withdrawal of Tank Lines (actually the subsidiary of a subsidiary) because Central Transport did not exercise control over Tank Lines until *after* the withdrawal occurred. Accordingly, although the court did focus on "the date of Tank Lines' withdrawal," the court clearly found Central Transport not liable because it had *never been* an employer as of that date. The court did examine the possibility of constructive ownership by Central Transport before the withdrawal, a clear question of statutory construction, and rejected that argument. *See Central Transport,* 640 F.Supp. at 58–60. Thus, the court could conclude as a matter of law that Central Transport had never been an employer as of the date of Tank Lines' withdrawal. In this case, by contrast, the issue is whether Banner, an *admitted* employer with respect to Commercial *before* Commercial's withdrawal, should now be held liable for that withdrawal. For all the reasons we explain above, we submit that this distinction is critical.

Banner in undertaking the ESOP transaction was to "evade or avoid" withdrawal liability, then Banner was still an "employer" at the time of Commercial's withdrawal and, as such, liable for that withdrawal. Conversely, if the factual determinations establish that Banner did not cause an interruption in payments and that the ESOP was not established to evade or avoid withdrawal liability, then Banner was not an "employer" on the date of Commercial's withdrawal and cannot be held liable for that withdrawal. Either way, Banner insists, the ultimate issue is whether Banner was an "employer" for purposes of assessing withdrawal liability.

We agree with Banner that the scope of an arbitrator's jurisdiction cannot turn on the presence or absence of factual disputes. Any factual disputes material to a determination whether the arbitrator has power to adjudicate a matter must be decided by a court. *See Association of Flight Attendants v. Republic Airlines, Inc.*, 797 F.2d 352, 357 (7th Cir.1986). However, we disagree with Banner that the factual disputes in this case bear on Banner's "employer" status. Rather, they bear on Banner's *continued* employer status, an inherently different question. It bears repeating that the statute does not contain language providing for changes in "employer" status as a result of certain actions by admitted employers; the statute provides only that in certain circumstances, an admitted employer will not be deemed to have *withdrawn* from the plan. It follows, then, that if Banner's sale of its wholly-

owned subsidiary is found not to have caused an interruption in contributions and not to have been a sham transaction, the legal effect is *not* that Banner was not an "employer"—this is simply not what the statute says—but is instead that Banner successfully effected a change in corporate structure without having withdrawn from the plan,[8] and that this change was not undertaken to evade or avoid withdrawal liability. Resolution of these issues in Banner's favor would establish that the plan sponsor's determinations were unreasonable or clearly erroneous,[9] and that Banner should not be assessed for Commercial's withdrawal. The point, however, is that it is the plan sponsor's determinations that are in issue, not Banner's employer status, and the statute unequivocally requires that disputes regarding the plan sponsor's determinations be resolved in arbitration. Because we find that Banner must contest its withdrawal liability assessment in arbitration, Central States' motion to dismiss is granted as to Count I.[10]

Central States urges that this court should enter judgment in its favor for the full amount of the assessment on the ground that the statute provides explicit time limitations within which to initiate the arbitration process, and Banner has allowed its time to expire. Central States thus concludes that Banner has waived its right to arbitrate the fact or amount of its withdrawal liability.

The case law interpreting the relevant provisions of MPPAA makes clear that the

---

**8.** We would note at this point that we have some difficulty understanding how Banner's ESOP transaction falls within the meaning of § 1398(1). In particular, it does not seem to us either that Banner has "ceased to exist" by reason of a change in corporate structure described in § 1362(d) or that Banner's "change in corporate structure" comes within any of those listed in § 1362(d). Regardless of the court's concern, however, Central States has never contested the applicability of § 1398(1) to transactions of this sort, arguing only that Banner is not entitled to the benefits of § 1398(1) because the change in corporate structure caused an interruption in employer contributions. In any event, our ruling that the merits of this case must be resolved in arbitration renders the issue, to the extent there is one, moot in this court.

**9.** *See* § 1401(a)(3)(A) and note 12 *infra*.

**10.** As a result, we need not pass on Banner's motion to strike the affidavit of Edward R. Young, and we need not decide whether, as Banner argues, a disputed issue of fact exists as to whether the trustees of Central States in fact made the determinations Central States alleges, i.e., that Banner did not come within the § 1398 safe-haven and that the ESOP transaction was designed to evade or avoid withdrawal liability. These matters, as well as resolution of any disputed issues found to exist, are for the arbitrator.

time limits are strictly construed and that failure to initiate arbitration within those time limits constitutes a waiver of the opportunity to do so. *See, e.g., Combs v. Harold,* No. 84–1789, mem. op. at 6–8 (D.D.C. Feb. 19, 1986) [Available on WESTLAW, DCT database]; *Combs v. Pelbro Fuel, Inc.,* No. 83–1524, mem. op. at 9–16 (D.D.C. Nov. 15, 1984) [Available on WESTLAW, DCTU database]; *Combs v. Adkins & Adkins Coal Co.,* 597 F.Supp. 122, 126 (D.D.C.1984); *Speckmann v. Paddock Chrysler Plymouth, Inc.,* 565 F.Supp. 469, 473 n. 2 (E.D.Mo.1983); *Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. Ceazan,* 559 F.Supp. 1210, 1218 (N.D.Cal.1983). These same courts have noted, however, that this strict forfeiture rule may be relaxed where the employer has taken certain actions which warrant a tolling of the statutory time frames. *See, e.g., Combs v. Adkins & Adkins Coal Co.,* 597 F.Supp. 122, 127 (D.D.C.1984). *See also Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund,* 718 F.2d 628, 644 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984).

■ We think that Banner's filing of this suit tolled the statutory time frames set forth in § 1401(a)(1). Like the court in *Flying Tiger,* we have found the issue raised by Banner to be a difficult one,[11] one that is not clearly addressed by the statutory provisions. Banner cannot be said to have rested on its rights. It was first notified by Central States of the assessment of withdrawal liability by a letter dated March 25, 1986, and it filed its complaint in this court on May 1, 1986, well before the period for initiating arbitration had run. This is not a case in which the party assessed did absolutely nothing, waited until the pension plan filed a collection action against it, and then for the first time tried to assert its defenses in court when it should have proceeded in arbitration. Banner took immediate and affirmative steps to contest its liability.

Central States argues that to accept Banner's tolling argument "would permit every employer contesting its withdrawal liability to ignore the statutory time limits with impunity simply by characterizing its challenge as an issue for resolution by the court, even where, as here, such characterization is meritless." Central States' Rep. Br., Oct. 2, 1986, at 15. Central States distinguishes this case from *Republic Industries,* arguing that the basis for tolling the limitations period in *Republic Industries* was the court's determination that Republic had made a not frivolous challenge to the constitutionality of the arbitration procedures, the validity of which had not previously been definitively decided. Central States maintains that Banner has made no such similar challenge.[12]

We do not agree that a decision to toll the statutory time periods in this case

---

11. On December 4, 1986, the district court in *Flying Tiger, Line., Inc. v. Central States Southwest and Southeast Pension Fund* [Available on WESTLAW, DCTU database] issued an opinion granting the employer's motion to permit an interlocutory appeal of its decision referring the matter to arbitration. Indicating that "[t]he Court has found the issues raised in Count I to be extremely difficult," op. at 4, the court certified the following question:

"May a corporation that legitimately believes its status as a MPPAA 'employer' is doubtful have that issue resolved by a federal court in a timely declaratory action, wherein the federal district court will determine the legal and factual issues necessary for a determination that the corporation is subject to MPPAA liability and procedures, or must the issue of MPPAA liability instead be determined by a MPPAA arbitrator." The Third Circuit granted the motion for leave to appeal on December 31, 1986.

12. The parties actually dispute whether Banner has made such a constitutional challenge. Banner refers in its briefs and, it argues, in its response to Central States' counterclaim to a due process challenge to MPPAA's arbitration procedures that is currently pending before the United States Supreme Court. *United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.,* 787 F.2d 128 (3d Cir.), *prob. juris. noted,* ── U.S. ──, 107 S.Ct. 567, 93 L.Ed.2d 572 (1986). Specifically, Banner urges that the presumption of correctness accorded the plan sponsor's determinations under § 1401(a)(3)(A) deprives Banner of due process. Central States argues that any reference to this challenge was made in a procedurally improper fashion and was, in any event, untimely. Our ruling on the waiver question obviates the need to resolve this dispute. To the extent Banner has properly articulated an argument that it would be unconstitutional to send Banner to arbitration, we note that

would produce the dire results Central States predicts. The court does not today hold that every arguable issue of statutory interpretation will toll the running of the period in which to initiate arbitration. Rather, the court finds the issue raised by Banner to be similar to those raised by Republic in *Republic Industries* in that in both cases, the issues raised questioned the *authority* of the arbitrator to bind the parties. Surely the arbitrator's role includes the application of the statutory provisions to the facts in a case. But if the issue is the constitutionality of the statutory provisions providing the arbitrator with his authority, as in *Republic Industries,* equity dictates that the time period for initiating arbitration be tolled until a determination is made that arbitration is not only proper but *possible.* Similarly, if the issue is whether or not one of the parties falls within the arbitrator's jurisdiction, as in this case, the same considerations of fairness dictate that the time for pursuing arbitration be tolled until a determination is made that the party is subject to the mandatory arbitration provisions. Like the issues raised in *Republic Industries,* the issue Banner raises has not been previously definitively decided. It is true that we have rejected Banner's argument, but we do not find Banner's position to be a frivolous one or one taken in bad faith. Accordingly, we conclude that Banner has not forfeited its right to initiate arbitration and that the filing of this action tolled the limitations period set forth in § 1401(a)(1).

### III.  *Banner's Motion for Summary Judgment*

In view of this court's ruling that the merits of this case must be decided in arbitration, Banner's motion for summary judgment must be and is denied.

### IV.  *Central States' Counterclaim for Interim Payments*

■ Central States has filed a motion for summary judgment on its claim for interim payments. The statutory language in § 1401(d) makes clear that the employer must make payments until the arbitrator issues a final decision on the matters submitted for arbitration, with adjustments to be made for overpayments (or underpayments) occurring as a result of the arbitrator's decision. Banner's only argument opposing Central States' demand is that the statute requires only "employers" to make interim payments. Banner's position that it is not an "employer" for purposes of determining withdrawal liability under MPPAA thus applies equally to its contention that it need not make interim payments. By the same token, our rejection of Banner's argument regarding "employer" status applies equally in this context. Accordingly, Central States' motion for summary judgment on its counterclaim for interim payments is granted, and Banner is ordered to begin making those payments on April 1, 1987. The court reserves ruling on the issue whether Banner must also pay Central States all arrearages on the interim payments, which, but for the filing of this action, would have been made beginning no later than sixty days after the date of the demand under § 1399(c)(2).

### Conclusion

For all the foregoing reasons, Central States' motion to dismiss is granted as to Count I, and this case is referred to arbitration. Banner's motion for summary judgment is, accordingly, denied. Central States' motion for summary judgment on its counterclaim for interim payments is granted, payments to begin on April 1, 1987.

---

Banner's challenge does not refer to the statutory *requirement* that it arbitrate, but only to the standard upon which the arbitrator is to review the plan sponsor's determinations. We further note that, as a practical matter, the Supreme Court will likely pass on the constitutionality of the presumption long before it becomes an issue in this case.