TEAMSTERS PENSION TRUST FUND OF PHILADELPHIA AND VICINITY, a multiemployer employee pension benefit plan, Charles J. Schaffer, Jr., a fiduciary, Plaintiffs,

v.

CENTRAL MICHIGAN TRUCKING INC., a Michigan corporation, Coast–To–Coast Transportation, Inc., a Michigan corporation, Transportation and Business Systems, Inc., a Michigan corporation, and Fuqua Industries, Inc., a Delaware corporation, Defendants.

No. G85–653 CA1.

United States District Court,
W.D. Michigan, S.D.

Sept. 17, 1987.

Theodore Sachs, Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman, P.C., Detroit, Mich., Kent Cprek, Sagot & Jennings, Philadelphia, Pa., for plaintiffs.

John Ohlweiler, Simpson, Thacher & Bartlett, New York City, Thomas P. Hogan, Mohney, Goodrich & Titta, P.C., Grand Rapids, Mich., for defendants.

## OPINION AND ORDER

MILES, Senior District Judge.

This action arises under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. § 1382.

Plaintiffs are seeking to collect withdrawal liability from Fuqua Industries Inc. (Fuqua), as well as various affiliates of Interstate Motor Freight Systems (Interstate). To date, only Fuqua has responded to the complaint and contested liability. All other named defendants are inactive and apparently insolvent. (*See* joint status report.) Consequently, the Court will treat Fuqua as the only defendant for purposes of this action.

Interstate was a wholly owned subsidiary of Fuqua from September 1968 through November 1, 1980. At that time, Fuqua distributed all of its shares in Interstate to the Fuqua shareholders in a distribution commonly known as a "spin-off." Prior to the spin-off, Fuqua had made contributions to the Teamsters Pension Trust Fund of Philadelphia and Vicinity (Fund) on behalf of the Interstate employees. After the spin-off, Interstate continued making contributions to the Fund until December of 1984, at which time Interstate's petition for reorganization under Chapter 11 of the Federal Bankruptcy Code was converted to a liquidation proceeding under Chapter 7.

The Fund contends that the spin-off of Interstate did not relieve Fuqua of pension debt liability which it accrued during its ownership of Interstate prior to the spin-off. The Fund argues that once Interstate stopped contributing to the pension plan in 1984 "Fuqua's 1980 debt was triggered." Furthermore, the Fund contends that Fuqua is responsible for the entire withdrawal liability of Interstate through 1984, since the principal purpose of the spin-off was to "evade or avoid" withdrawal liability.

Fuqua counters that the spin-off of Interstate was not designed to "evade or avoid" withdrawal liability for Interstate's obligations to the Fund. Fuqua also contends that the spin-off severed all pre-existing relationships between itself and Interstate thus relieving it of any potential withdrawal liability due to Interstate's 1984 withdrawal from the Fund.

The Court's jurisdiction is noted. 29 U.S. C. § 1451, 28 U.S.C. § 1331.

Now before the Court are motions for partial summary judgment filed by the plaintiffs and for summary judgment by the defendants. The motions are brought pursuant to Fed.R.Civ.P. 56. Both parties have filed briefs and reply briefs with attachments. The parties agree that the issues arising under Count I require statutory interpretation and thus are amenable to decision by this Court on the motions.

### DISCUSSION

To warrant the grant of summary judgment, the moving party bears the burden of establishing the non-existence of any genuine issue of fact that is material to a judgment in his favor. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 147, 90 S.Ct. 1598, 1602, 26 L.Ed.2d 142 (1970); *United States v. Articles of Device*, 527 F.2d 1008, 1011 (6th Cir.1976). Irrespective of the assertion of the parties, the Court is obligated to search the record to determine whether genuine issues of material fact exist. *Bradford v. General Telephone*, 618 F.Supp. 390 (W.D.Mich.1985).

Upon review of the pleadings, the Court finds that Count I of plaintiffs' complaint is amenable to decision upon the briefs.

In their motion for partial summary judgment, plaintiffs contend that Central Michigan Trucking (CMT), Coast-to-Coast Transportation Inc. (CCT); Transportation and Business Systems, Inc., (TBS), IMFS, Inc., Southwest Freight Systems, Inc., and Interstate System Steel Division, Inc. are or were wholly-owned subsidiaries of Interstate. However, none of the above-named defendants have appeared or contested liability in this matter and, as previously noted, all are considered inactive and/or insolvent.

Fuqua, the sole defendant for purposes of this action, was the parent and sole shareholder of Interstate from September 1968 through November 1, 1980. Based on this relationship, the Fund has assessed withdrawal liability against Fuqua as an employer on the basis of 29 U.S.C. §§ 1398, 1362(d), 1301(b)(1) and 1392(c). Plaintiffs also allege that Fuqua has failed to make required payments of withdrawal liability under 29 U.S.C. § 1399(c)(2). Plaintiffs re-

quest that the Court order payment of past due and future interim withdrawal liability installments under Count I of the complaint. In addition, plaintiffs request that Count II be remanded for arbitration after the Court renders a decision on the issues involved in Count I.

In response to the motion for partial summary judgment, Fuqua has filed a brief in opposition as well as a motion for summary judgment as to both Counts I and II.

Fuqua contends that subsequent to November 1, 1980, Interstate and itself existed as separate and independent companies. Since it was not a member of a common control group with Interstate at the time of Interstate's withdrawal from the Fund, Fuqua argues that no withdrawal liability can attach to it. Fuqua also contends that there is no genuine issue of material fact with respect to Count II of the complaint. In this regard, Fuqua contends that the affidavit of Lawrence P. Klamon, President and Chief Operating Officer of Fuqua Industries, demonstrates that the spin-off was undertaken for legitimate business purposes. Fuqua adds that plaintiff's request for arbitration as to Count II should also be denied.

## STATUTORY OVERVIEW

With the enactment of the Employee Retirement Income Security Act (ERISA) in 1974, Congress established funding and vesting standards for private pension plans. In so doing, Congress set out to ensure private sector employees who were promised certain benefits upon retirement would actually receive them. Through ERISA Congress established the Pension Benefit Guaranty Corporation (PBGC) to administer a termination insurance program for tax qualified pension plans, including multi-employer plans. The termination insurance program is financed by assets of terminated pension plans, payments by contributing employers, and premiums paid by covered plans. It guarantees benefits for employees of a covered plan which terminates without sufficient assets to pay the promised pensions. Under the initial ERISA framework, contribu-

ting employers who withdraw from a plan often incurred no liability while ridding themselves of a heavy financial burden, while those who stayed with a plan were penalized; having to cover the shortage caused by the withdrawing employers. In short, ERISA, as originally enacted, did not provide compensation to the multi-employer plan for a withdrawal by a contributing employer. *See* 1980 U.S.Code Cong. and Adm.News, p. 2928 *et seq.* In 1980, Congress enacted MPPAA, 29 U.S.C. § 1381 *et seq.* to remedy these problems. MPPAA requires a withdrawing employer to continue funding a proportional share of the plan's unfunded benefit obligations upon withdrawal. MPPAA was designed to:

> relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers.

*Id.* at 2935.

It is plaintiffs' contention that to remain consistent with the spirit of MPPAA, any business which was an employer or member of a control group as defined under the Act must be held accountable for a contingent withdrawal liability for the time period during which it was an employer or member of the control group. Plaintiffs suggest that this "accrued" withdrawal liability does not become payable immediately upon a change of corporate structure, rather it is deferred as long as the new corporate entity contributes to the pension plan.

Both parties agree that the 1980 spin-off of Interstate was a "change in corporate structure" under 29 U.S.C. § 1398. However, the parties differ on the ultimate effect this spin-off had on Fuqua's withdrawal liability.

Upon review of the multifaceted arguments through which plaintiffs attempt to construct a mosaic of "contingent withdrawal liability," the Court finds that these contentions, while being arguable in the abstract, are not supported by MPPAA or case law interpreting it. Thus, for the following reasons, plaintiffs' motion for partial summary judgment is denied and

defendants' motion for summary judgment as to Count I is granted.

In order to apply the statutory language of MPPAA to the controversy at bar, the Court must "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 590, 7 L.Ed.2d 492 (1961). In enacting ERISA and its subsequent amendments, Congress did not "merely select a broad policy goal and instruct the Courts to achieve that objective." *Central States v. Bellmont Trucking*, 788 F.2d 428 (7th Cir. 1986). Rather, Congress clearly set forth the rules and exceptions with which to achieve these goals. *Id.* Consequently, the Courts should not create withdrawal liability beyond that set forth in the statute as written; particularly when such an interpretation has no basis in the plain language of the statute.

Fuqua does not dispute that it was an employer with respect to Interstate prior to the November 1980 spin-off. 29 U.S.C. § 1301(b)(1). Both parties agree that the spin-off should be considered a change in corporate structure as described in 29 U.S. C. § 1362(d)(3) [as written prior to the April 7, 1986 amendments]. *See also Dorn's Transportation, Inc. v. Teamsters Pension Trust Fund*, 787 F.2d 897 (3rd Cir.

1986). Furthermore, it is agreed that Fuqua did not incur contemporaneous withdrawal liability as a result of the November 1980 spin-off. 29 U.S.C. § 1398.

## COUNT I

The gravamen of plaintiffs' complaint is that the change in corporate structure, which did not result in immediate withdrawal liability, created a contingent liability that was revived and became collectible when Interstate withdrew from the Plan.

Plaintiffs' strained attempt to impose such liability suffers from a lack of statutory or judicial authority. MPPAA, which accounts for all other contingencies by setting forth when withdrawal liability occurs, how it is to be collected upon cessation of a business which requires that a sale of assets be accompanied by posting of bond in order to assure continued funding, and which allows transactions made to evade or avoid withdrawal liability to be ignored; (29 U.S.C. §§ 1382, 1383, 1384, 1385, 1386, 1391, 1392) does not provide for the kind of contingent liability plaintiffs ask this Court to impose. Consequently, plaintiffs are forced to analogize with other areas of law and to make theoretical arguments based on alleged congressional intent not embodied in an otherwise enumerative statute.[1] 29 U.S.C. § 1398 provides:

---

1. 29 U.S.C. § 1301(b) provided that the PBGC shall issue regulations on groups of trades or businesses under common control. Plaintiffs contend that these rules, when promulgated, will be based on existing tax regulations for similar corporate groups. Plaintiffs attempt to analogize between section 355 of the Internal Revenue Code, 26 U.S.C. § 355 and MPPAA.

Plaintiffs contend that section 355 which provides that certain distributions of securities by controlling corporations will not result in recognized gain or loss to the distributee shareholders at the time of distribution and which treats entities emerging from the division as a continuation of the former entity for tax purposes, should be used to determine the relationship of spun-off corporations under MPPAA for purposes of withdrawal liability. While plaintiffs assert that "the same result occurs with withdrawal liability," they are unable to point to any portion of MPPAA which requires such a result. In fact, 29 U.S.C. § 1398 provides that the successor corporation will be considered the "original employer" for purposes of MPPAA.

There is no indication or mention of the continued treatment of the parent and spun-off corporation as co-employers under the act. Nor is there any statement which indicates that these companies will be considered members of the same control group after the spin-off. The treatment of spun-off corporations differs depending on the particular area of law applicable. While there may be a valid tax reason to consider the spun-off corporation to be a continuation of the old, that characterization is not universally applicable for all purposes. To say that it is, is to nullify any business purpose for allowable changes in corporate structure. One common thread in all situations concerning corporate changes is that those changes accomplishing illegal purposes, such as to shield income under the tax law; to evade withdrawal liability under ERISA; or to defraud creditors will be ignored. *See* 26 U.S.C. § 355, 29 U.S.C. § 1395. Aside from that example, plaintiff's bald statement that treatment of spun-off corporations under one statute should be treated likewise under another statute is not convincing on the facts before the Court.

Withdrawal not to occur merely because of change in business form or suspension of contributions during labor dispute.

Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because—

(1) an employer ceases to exist by reason of—

(a) a change in corporate structure described in section 1362(d) of this title, or

(b) a change to an unincorporated form of business enterprise, if the change causes no interruption in employer contributions or obligations to contribute under the plan, or

(2) an employer suspends contributions under the plan during a labor dispute involving its employees.

For purposes of this part, a successor or parent corporation or other entity resulting from any such change shall be considered the original employer.

As noted, MPPAA provides that the corporation resulting from the spin-off will be considered the "original employer."

Neither "original employer" nor "employer" is defined in Title IV of the Act. Consequently, the initial inquiry focuses on the plain meaning of the statute. *Richards*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492, *supra*.

Thus, it appears that a spin-off corporation will assume the position previously held by the corporation from which it was spun off. This concept is not consistent with 26 U.S.C. § 355 which considers such corporations to be continuations of the entity for tax purposes. (*See* note 1, *supra*). Consequently, if a spun-off corporation is to be considered "the original employer" for purposes of withdrawal liability, where does that leave the corporation from whence it was extracted? To accept plaintiffs' argument, one would have to strike the last paragraph of Section 1398 or at least amend it to read:

For purposes of this part, a successor or parent corporation or other entity result-

ing from such a change shall be considered an original employer.

As the statute reads now there can be only one original employer. Thus, when that employer withdraws from the plan, the statute leaves no room for a previous "employer" to step in and make up any withdrawal liability left unpaid by the spun-off company.

Terming the spun-off company as the "original employer" clearly shows that under MPPAA the new employment entity will be deemed the original employer, consequently only that employer and any control group to which it belongs at the time of withdrawal will be responsible for withdrawal liability.

Contrary to plaintiffs' assertions, no judicially created precautions regarding contingent withdrawal liability are necessary to keep the statute in accord with congressional intent. The scenario whereby spin-offs would allow companies to dump unprofitable subsidiaries and thus avoid withdrawal liability was envisioned and resolved by 29 U.S.C. § 1392(c), which provides:

If a principal purpose of any transaction is to evade or avoid liability under this part this [§ 1392] shall be applied (and liability shall be determined and collected) without regard to such transaction.

Thus, irrespective of the "original employer" language of section 1398, if the change in business form occurred pursuant to a plan to evade or avoid liability, withdrawal liability would still be imposed pursuant to section 1392. (Plaintiffs' allegation that Fuqua violated section 1392 set forth in Count II will be discussed later.)

The existence of section 1392(c) obviates the need for a complex system of contingent withdrawal liability *ad infinitum* proposed by the plaintiffs. Furthermore, section 1392(c) supports the conclusions that Congress did not intend such liability to exist because, in the situations where such corporation changes are made in order to subvert MPPAA, the Act allows the trustees to ignore the transaction.

There is no congressional mandate to engage in legal gymnastics in order to guarantee pension plans at all costs. The courts have declined to impose withdrawal liability on corporate officers and shareholders by piercing the corporate veil. *Connors v. P & M Coal Co.*, 801 F.2d 1373 (D.C.Cir.1986); *Solomon v. Klein*, 770 F.2d 352 (3rd. Cir.1985); or to apply the statute in a nonsensical fashion in order to assure full payment of withdrawal liability. *In re Challenge Stamping and Porcelain Co.*, 719 F.2d 146 (6th Cir.1983).

Embracing the contingent liability theory advanced by the plaintiffs would not only make Section 1392(c) superfluous, it would also impose a "deep-pocket" approach of pension fund financing in the event of business failure or corporate restructuring. Congressional history does not suggest that MPPAA was designed to find a deep pocket for payment of withdrawal liability every time a *bona fide* change in corporate structure was followed by failure of the new business entity. Nor would such a policy make sense in a business structure based on capitalism. Rather, the overriding purpose of the statute is to impose liability upon those parties responsible for continued funding of the plan at the time of withdrawal. *See In re Challenge Stamping and Porcelain Co., supra; Jaspan v. Certified Industries Inc.*, 658 F.Supp. 332 (E.D.N.Y.1986).

■ Consequently, if a transaction or change in corporate structure was not a sham, and if a successful change in corporate structure was accomplished without incurring contemporaneous withdrawal liability, then withdrawal liability cannot be assessed against the predecessor corporation upon failure or withdrawal of the successor. *See Banner Industries Inc. v. Central States Pension Fund*, 657 F.Supp. 875 at 883 (N.D.Ill.1987).

Plaintiffs' do not assert that the November 1980 spin-off failed to bring about a successful change in corporate structure. Nor is it alleged that withdrawal liability was incurred as a result of the spin-off. Setting aside the allegation that the spin-off was engineered in order to evade or avoid withdrawal liability, said claim being set forth in Count II, the Court finds that defendant Fuqua is entitled to summary judgment as to Count I of the complaint and the same is hereby dismissed.[2]

## COUNT II

Plaintiffs allege that the spin-off of Interstate was an evasive transaction pursuant to 29 U.S.C. § 1392(c). Defendant has requested summary judgment as to Count II supporting its motion by affidavit setting forth genuine business reasons for the spin-off. Plaintiffs counter by noting that intent to evade is a factual issue requiring evaluation of credibility and is not amenable to decision on summary judgment. Plaintiffs also contend that Count II must be submitted to arbitration citing 29 U.S.C. § 1401.

Count I having been previously dismissed, the case becomes one which turns on the "evade or avoid" issue. Although questions of statutory interpretation such as those posed in Count I of this complaint do not require arbitration. *Central States Pension Fund v. 888 Corporation*, 813 F.2d 760 (6th Cir.1987); *Dorn's Transport*, 787 F.2d at 903 *supra; NY Teamsters v. McNicholas*, 658 F.Supp. 1469 (N.D.N.Y. 1987), the statute contemplates that "evade or avoid" issues should be brought before an arbitrator. *Flying Tiger Lines v. Central States Pension Fund*, 659 F.Supp. 13 (D.C.Del.1986), *Banner Industries v. Central States Pension Fund*, 657 F.Supp. 875 (N.D.Ill.1987).

Furthermore, the failure to submit a claim to arbitration within the time limits set forth in section 1401(a)(1) does not forfeit that right in all instances. *Banner, supra* at 885.

**2.** As noted, Fuqua is the only defendant to appear or answer the complaint. Thus, for all purposes, it is the only defendant in this action.

In the case *sub judice* it is apparent that the parties contemplated a judicial resolution of the legal issues contained in Count I prior to making a determination to arbitrate those issues requiring finding of fact.[3] (*See* exhibit 1 to pleading number 14, and exhibit 1 to pleading number 7 set forth in note three below). Thus, as in *Banner*, the time for requesting arbitration was tolled by the filing of this action. Consequently, defendants' motion for summary judgment as to Count II is premature and resolution thereof would be improper at this time.

Accordingly, Count I is dismissed and the case is remanded for arbitration proceedings under 29 U.S.C. § 1401 as to Count II.[4]

IT IS SO ORDERED.

---

**3.** The following exhibits evidence the intention of the parties to resolve the legal issues set forth in Count I prior to reaching a determination on arbitration.

> Since the issues raised herein on Fuqua's behalf are primarily of a legal, rather than a factual, nature we would request that an initial determination be made on these issues before proceeding to address any of the underlying factual matters in accordance with the Fund's normal review procedure. We request that, pending a decision concerning the legal issues herein, you hold open the formal review procedure for further consideration of any additional (primarily factual) issues raised in connection with the bankruptcy of Interstate, to be considered in the event you do not reach a favorable decision on the issues herein presented.
>
> (Letter from Fuqua expressing/requesting resolution of legal issues prior to arbitration, Docket Number/Pleading number 14, exhibit number 1.)
>
> In your request for review, you asked that we attempt to resolve the primarily legal nature

of Fuqua's liability under ERISA § 4218(1) before proceeding to underlying factual matters. The Fund of liability under ERISA §§ 4218(1), based on the undisputed fact of prior affiliation. Resolution of this question in this expedited fashion may result in substantial savings in arbitration costs and will allow the parties to reevaluate their positions after resolution of this legal question of first impression. We will consider your July 8, 1985 letter a request for review and arbitration on all underlying factual matters to the extent permitted by law. Please, however, note 29 U.S.C. § 1401(a) and the enclosed rules of the Fund requiring initiation of arbitration at the Philadelphia office of the American Arbitration Association. It is the practice of the trustees, as fiduciaries, to reserve all defenses.

> (Letter from plaintiff trust fund agreeing with Fuqua's request to hold off arbitration pending resolution of legal issues. Pleading number 7, exhibit number 1.)

**4.** *See* footnote 3, *supra.*