DORN'S TRANSPORTATION, INC., and Oneida Motor Freight, Inc., Appellees,

v.

TEAMSTERS PENSION TRUST FUND OF PHILADELPHIA AND VICINITY, Appellant.

No. 85–5006.

United States Court of Appeals, Third Circuit.

Argued Feb. 13, 1986.

Decided April 7, 1986.

Lester M. Bridgeman, Louis E. Emery (argued), Bridgeman & Urbanczyk, Washington, D.C., for appellees.

Paul A. Friedman (argued), Cohn & Lifland, Saddle Brook, N.J., for appellant.

Before HUNTER and BECKER, Circuit Judges, and HUYETT, District Judge.[*]

## OPINION OF THE COURT

BECKER, Circuit Judge.

This case presents the question of whether, under the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. § 1381 et seq., an employer-member of an ERISA pension plan may be assessed withdrawal liability when it sells all of its stock to another employer that assumes the operations of the corporate seller and employs most of its employees, and, by virtue of its independent collective bargaining agreement with the same pension plan, continues to make the payments formerly made by the first employer. In the unusual circumstances of this case, we hold that no liability-creating withdrawal took place, and that the assessment of withdrawal liability was improper. We therefore affirm the district court's judgment, 596 F.Supp. 350, declaring that no withdrawal took place and enjoining the pension plan from taking action to collect withdrawal liability payments.

## I. FACTS AND PROCEDURAL HISTORY

Co-appellee Dorn's Transportation, Inc. ("Dorn's"), a motor freight carrier, was a contributing member of appellant Teamsters Pension Trust Fund of Philadelphia and Vicinity ("the Plan"), a pension plan governed by the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., as amended by the Multiemployer Pension Plan Amendments Act (MPPAA), 29 U.S.C. § 1381 et seq. (1982). On March 2, 1981, Dorn's shut down its terminal in Pennsauken, New Jersey. That day, co-appellee Oneida Motor Freight entered into a contract (subject to ICC approval) with Dorn's Chief Executive Officer and principal stockholder, Walter Dorn, to purchase all of Dorn's outstanding stock. The transaction involved the assumption of Dorn's operating rights by Oneida and the de facto dissolution of Dorn's.

Oneida offered employment to all twelve of the former Dorn's employees at the Pennsauken facility.[1] Ten accepted and were moved to Oneida's Pennsauken facility. All ten were union members on behalf of whom Dorn's, by virtue of a collective bargaining agreement, had been making weekly contributions to the Plan. For a number of years, as the result of an independent agreement with the Plan virtually identical to Dorn's agreement with the Plan, Oneida had also made payments to the Plan on behalf of its employees who were union members. Thus, Oneida continued to make payments to the Plan on behalf of the former Dorn's employees who accepted employment with Oneida. These employees were dovetailed with the other Oneida employees in Oneida's seniority roster.

Shortly after receiving the Dorn's stock, Oneida learned that Dorn's faced potential withdrawal liability to the Plan for which Oneida, as a "commonly controlled" company, might be jointly liable under 29 U.S.C. § 1301.[2] Oneida refused to pay Dorn's the purchase price of Dorn's stock, alleging that Dorn's had breached the contract by failing to disclose the potential withdrawal liability. Walter Dorn took the matter to arbitration, where he prevailed. When Oneida refused to comply with the arbitrator's decision, Walter Dorn brought suit in United States District Court for the Southern District of New York to confirm and

---

[*] Honorable Daniel H. Huyett, 3rd, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Dorn's had a number of other terminals, but this case concerns withdrawal liability stemming from Dorn's shut-down at the Pennsauken facility only.

2. Section 1301(b) says, in relevant part, that

For purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer.

enter judgment upon the arbitration award. The court, however, dismissed the case for lack of jurisdiction. *Dorn v. Dorn's Transportation and Oneida Motor Freight,* 562 F.Supp. 822 (S.D.N.Y.1983). The record does not reveal exactly what accommodation was reached, but we do know that the sale of stock was consummated.

On February 4, 1983, the Plan notified Dorn's that its trustees had assessed a total of over $315,000 in withdrawal liability against Dorn's (for which, as noted, Oneida might be jointly liable). On June 1, 1983, Dorn's and Oneida filed a complaint in the district court for the District of New Jersey seeking a declaratory judgment that various provisions of MPPAA are unconstitutional. On March 12, 1984, the district court issued an order permitting appellees to file an amended complaint that added a statutory argument to their constitutional argument. The statutory argument is that under 29 U.S.C. § 1301, *see supra* note 2, and also under § 1398 which provides a safe haven in the event of certain changes in corporate structure, no withdrawal took place and therefore no withdrawal liability is owing.[3]

On September 14, 1984, Dorn's and Oneida moved for summary judgment. In its opposition to this motion, the Plan sought discovery pursuant to Fed.R.Civ.P. 56(f). The items it sought were depositions of two individuals involved in the Dorn's/Oneida transaction—Walter Dorn and Oneida agent Paul McGoldrick. In its affidavit, and in a hearing before the district court on September 14, 1984, the Plan explained that these depositions were relevant because unless the Dorn's/Oneida transaction was *bona fide* and arms length, it could not come within the safe harbor of § 1398. On October 25, 1984, the district court denied the motion for additional discovery and issued an order granting summary judgment for Dorn's and Oneida. The district court held that under both §§ 1301 and 1398, no

withdrawal took place. *Dorn's Transportation, Inc. v. Teamsters Pension Trust Fund of Philadelphia and Vicinity,* 596 F.Supp. 350 (D.N.J.1984). The district court made findings that the Dorn's/Oneida transaction was indeed *bona fide* and arms length, but gave no indication as to exactly how that factual finding affected its holding. *Id.* at 354.

## II. STATUTORY SCHEME; PARTIES' CONTENTIONS

Under ERISA, as amended by MPPAA, employers contribute to a pension plan on behalf of each of their employees who is a member of a participating union. The amount of the payments is determined by a collective bargaining agreement between each employer and its employees. The plan is administered by trustees, half of whom are chosen by contributing employers and half by the union. 29 U.S.C. § 186(c)(5)(B).

When an employer withdraws from a pension plan, it incurs "withdrawal liability," the amount of which is determined by the plan trustees. 29 U.S.C. § 1381. A withdrawal is defined by § 1383:

> For purposes of this part, a complete withdrawal from a multiemployer plan occurs when an employer—
>
> (1) permanently ceases to have an obligation to contribute under the plan, or
> (2) permanently ceases all covered operations under the plan.

However, there are several statutory exemptions to withdrawal liability. The exception most germane to this case, § 1398, establishes that a withdrawal has not taken place in the case of certain "change[s] in corporate structure." As noted, in the instant case the district court found that, by virtue of § 1398, no withdrawal took place.

The district court also found that § 1301 exempted Dorn's from withdrawal liability. Section 1301(b) states that "commonly controlled" companies are to be treated as a single employer for the purposes of ERISA, *see supra* note 2. Finding that

---

**3.** Subsequent to the filing of this lawsuit, Oneida filed a Chapter 11 bankruptcy proceeding and ceased contributing to the Plan. As of the date of oral argument, it had not been assessed withdrawal liability, but it is clearly only a matter of time until an assessment is made.

Oneida and Dorn's were commonly controlled, and that Oneida continued to make payments to the Plan, the district court held that by virtue of § 1301, no withdrawal had taken place. 596 F.Supp. at 354–55.

On appeal, the Plan argues that the district court erred in its interpretation of both §§ 1301 and 1398. Because we find that the transaction at issue was exempt under § 1398, we leave for another day the correctness of the district court's problematic holding with respect to § 1301.[4]

### III. *IS DORN'S EXEMPT UNDER § 1398?*

Section 1398 provides that *no* withdrawal has taken place if

(1) an employer ceases to exist by reason of—

(A) a change in corporate structure described in § 1362

... if the change causes no interruption in employer contributions or obligations to contribute under the plan.

The definition of a change in corporate structure in § 1362 is:

(1) ... a reorganization which involves a mere change in identity, form or place of organization.

(2) ... a liquidation into a parent corporation

(3) ... a merger, consolidation, or division.

The question presented here is whether the Dorn's/Oneida transaction falls under this statutory exemption. The district court believed that it did. The Plan makes essentially two arguments in opposition. First, the Plan argues that a straightforward reading of § 1398 shows that the

Dorn's/Oneida transaction is not covered by the statute. The Plan points out that, while payments continued, the *obligation* to make payments was interrupted, removing the transaction from § 1398's coverage.

In the alternative the Plan argues that the Dorn's/Oneida transaction *may* have been a bad faith effort to avoid liability, hence governed by § 1392(c) which states that "If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction." Thus the Plan contends that additional fact-finding (with respect to the *bona fides* of the Dorn's/Oneida transaction) was necessary and that the district court abused its discretion by denying the Plan's discovery request and bypassing arbitration.

It would seem logical to discuss first the bypassing of arbitration and denial of discovery because if the district court should not have ruled at all, then its judgment must be reversed regardless of the correctness of its statutory interpretation. However, the question at the heart of these issues—whether the *bona fides* of the Dorn's/Oneida transaction presented a material factual dispute—is understood best in the context of a discussion of the proper interpretation of § 1398. Accordingly, we shall begin our analysis by discussing the Plan's contention that the district court misconstrued this statute in applying it to the Dorn's/Oneida transaction.

### A. *The Alleged Interruption in the Obligation To Make Payments*

■ The district court believed that under § 1398 no withdrawal had taken place

---

**4.** The Plan contends that § 1301(b), which is part of the definitional part of ERISA rather than a provision in MPPAA concerning exemptions from liability, should not be interpreted to enable an evasion of withdrawal liability; rather, it is only a device to assist the collection of withdrawal liability by imposing liability on enterprises other than the withdrawing employer. The potential problem with the district court's interpretation of § 1301 is that it may risk making that section a catch-all exemption that enables circumvention of the requirements of the

explicit exemptions such as §§ 1384 and 1398. Section 1384 allows the sale of assets to avoid liability *if* 1) there is a *bona fide* arms length transaction; and 2) the buying company pledges to assume the contribution history of the selling company. Section 1398 allows a corporate restructuring to avoid liability *if* there is no interruption of the obligation to contribute. Section 1301 has no such requirements; if it can be used as a withdrawal-escaping device, the other exemptions may thus be rendered nugatory.

because Oneida had purchased all of Dorn's stock, thereby meeting § 1362's requirement of a change in corporate structure, and had continued to make payments on behalf of the former Dorn's employees under its own collective bargaining agreement with the Plan, thereby meeting § 1398's requirement that no interruption in contributions be caused.

The Plan submits that this analysis is erroneous because Oneida did not assume Dorn's *obligation* to continue pension payments, even though it continued to make the payments. The Plan observes, and Dorn's concedes, that Oneida did not assume Dorn's contractual obligation to make payments, but rather made payments because of and pursuant to its own independent collective bargaining agreement with the Plan. The Plan thus argues that there was an interruption in the obligation to contribute to the Plan.

The district court believed that this argument exalted form over substance. It observed that

> the Dorn's-Oneida employees ... are in substantially the same position as they were before the sale. All Dorn's employees at the Pennsauken terminal were given the opportunity to continue employment with Oneida, and ten of the twelve employees did so ... they continue membership in the same union local; and Oneida continues to contribute to the fund in their behalf. They may not be under the same collective bargaining agreement as they had with Dorn's, but their seniority rights [were unaffected]
> ...

596 F.Supp. at 355. In the unusual circumstances of this case, where the buyer and seller had identical collective bargaining agreements with the Plan, we believe that the district court was correct in concluding that, under § 1398, there was no withdraw-

al. Because Oneida's collective bargaining agreement with the Plan was identical to Dorn's, and Oneida dovetailed the former Dorn's employees into its own seniority roster, there was no interruption in the obligation to make contributions. Just as Dorn's had been obligated to make payments on behalf of its employees, so Oneida had the obligation to make payments on behalf of those employees (Actually Oneida made 90 percent of the payments Dorn's had been making. The gap exists because some former Dorn's employees chose not to accept Oneida's offer of employment). We need not decide whether § 1398 would apply if the purchasing company had had a different collective bargaining agreement from that of the seller. In this case, in which Oneida continued to make the same payments as Dorn's would have made but for the transaction, the Plan's assessment of $315,000 liability would result in a windfall to the Plan and a multiple injury to defendants.[5]

The Plan points out that, after purchasing Dorn's stock and hiring Dorn's employees, Oneida could have laid off some or all of the Dorn's employees. Since Oneida has a larger contribution base to begin with, doing so would not necessarily trigger a partial withdrawal.[6] Thus although Oneida did, in fact, make most of the payments Dorn's would have made if it had not gone out of business, it might have been able to avoid doing so and the Plan would have had no recourse. The Plan argues that Congress, which passed MPPAA to ensure the solvency and stability of pension plans, could not have intended to leave open this possibility of diminished contributions. However, this argument proves too much. Even if Oneida *had* been bound by the terms of Dorn's collective bargaining agreement, and thus there had not been even a technical interruption in the obligation to make payments to the Plan, Onei-

---

**5.** Withdrawal liability protects pension plans from losing payments as a result of an employer's withdrawal. In this case, the payments not made by Dorn's on behalf of its employees were made by Oneida. Therefore, for Dorn's and Oneida to be liable as a result of Dorn's putative

withdrawal would result in surplus payments on behalf of the former Dorn's employees.

**6.** Under § 1385, a 70% decline in an employee's contributions results in a partial withdrawal and, therefore, an assessment of liability.

da could nevertheless have laid off the former Dorn's employees without triggering a partial withdrawal. In other words, § 1398 clearly leaves open the possibility feared by Dorn's—a small company merging into a larger company, and the larger company proceeding to lay off some of the workers without triggering even a partial withdrawal.

Congress did, however, provide protection against transactions designed to evade liability in this or any other manner. Section 1392 states that transactions entered into primarily to evade liability cannot circumvent liability, and authorizes the plan trustees, in determining whether and how much withdrawal liability is owing, to disregard such transactions. Thus, the Plan's argument that the exemption should have been denied because Oneida could have laid off the former Dorn's employees is best considered in the analysis of § 1392's "good faith" requirement. We now turn to this argument.

### B. *Section 1392's Good Faith Requirement, the Bypassing of Arbitration and Denial of Discovery*

The Plan argues that a § 1398 exemption was inappropriate in this case on the facts of record, and at all events was inappropriate until the development of a factual record which established that the Dorn's/Oneida transaction did not run afoul of § 1392's good faith requirement. Thus the Plan argues that the district court abused its discretion in denying the Plan's discovery request and in bypassing arbitration. *See Republic Industries v. Central Pennsylvania Teamsters Pension Fund,* 693 F.2d 290 (3d Cir.1982) (arbitration may be bypassed only in rare cases; it should not be bypassed where it could develop a factual matrix that would assist the district court).

We begin by noting that we are not dealing with a transaction in which *both* buyer and seller conspired to reduce payments or liability to a pension plan. Rather, it is indisputable that Oneida was unaware that Dorn's was trying to escape

liability of any sort. Indeed, when Oneida found out about Dorn's potential liability, it refused to pay Dorn's the purchase price and the parties went to arbitration. Moreover, Oneida did, in fact, offer employment to all of the former Dorn's employees and made payments on behalf of all those employees who accepted this offer. The Plan speculates that, now that Oneida has filed for a Chapter 11 bankruptcy proceeding and presumably withdrawn from the plan, the assessment of withdrawal liability against Oneida may be less than it would have been if withdrawal liability were assessed against Dorn's and Oneida separately. The truth of this proposition is far from clear and appellees' counsel suggested at oral argument that the reverse may be true. In any event, it is clear that Oneida did not intend to go into bankruptcy when it purchased Dorn's stock; thus, any gap does not result from an intentional evasion of liability.

 Surely, § 1392 was designed to guard against the intentional evasion of liability. It may be that Walter Dorn entered into the transaction with Oneida in order to escape withdrawal liability (There is no evidence to this effect on the record but we will assume it to be so *arguendo*). However, when the seller enters a transaction to escape liability, but the buyer has no intention of taking subsequent actions that will reduce the payments owing to the Plan, it does not appear that a "principal purpose of the transaction" as a whole is to escape liability. Here, given Oneida's lack of awareness of Dorn's potential liability and Oneida's long period of continued payments, Oneida cannot be said to have entered the transaction in order to evade liability.

In short, the kind of bad faith that § 1392 guards against is not at issue in this case. Since the Dorn's/Oneida transaction did not involve the kind of bad faith addressed by § 1392, there was no disputed issue of material fact. Therefore, the district court did not abuse its discretion in denying Dorn's request to depose Walter Dorn and Paul McGoldrick. *See Aviation*

*Specialties, Inc. v. United Technologies Corporation,* 568 F.2d 1186, 1190 (5th Cir. 1978) (denial of discovery reviewed on abuse of discretion standard; "[w]hen the record becomes clear enough to disclose that further discovery is not ... likely to produce a genuine issue of material fact, discovery should be ended.") However, there is still a question as to whether it was proper for the district court to bypass arbitration.

■ In *Republic Industries, supra,* this court held that under MPPAA there is no *per se* exhaustion requirement under which the court lacks jurisdiction to hear cases that have not first been before an arbitrator. In that case we held that a facial constitutional challenge was one that could be heard in the first instance by the district court and also suggested that arbitration could be bypassed in the rare cases in which it would be of little use. We cited several relevant considerations: whether the issue was one in which an arbitrator would have special expertise; whether there was a reasonable possibility that arbitration would moot further proceedings and thus serve the goals of judicial economy; and whether arbitration would help develop a fuller factual record that would assist the district court. 693 F.2d at 295–96.

The D.C. Circuit recently analyzed these very considerations in deciding the precise question facing us today, *i.e.,* whether arbitration may be bypassed when the district court faces only questions of statutory interpretation. The court held that it could, stating:

> [W]e note that the issue before the district court was purely one of statutory interpretation ... Because there are neither questions of fact nor issues of contractual interpretation to resolve, an arbitrator skilled in pension and labor matters would have no superior expertise to offer.
>
> Second, under the specific circumstances present here, it is unlikely in the extreme that requiring arbitration will promote judicial economy by resolving extra-

judicially the dispute ... Under the statute both the Company and the Fund are entitled to bring an action to vacate the arbitrator's award. 29 U.S.C. § 1401(b)(1). In a dispute like this one, it seems highly improbable that a judicial action to vacate the award will not immediately follow on the heels of the arbitrator's decision.

*I.A.M. National Pension Fund v. Stockton TRI Industries,* 727 F.2d 1204, 1210 (D.C.Cir.1984). This discussion applies equally to the case at bar. As this was a rare case in which there was no need for the development of a factual record, we do not believe the district court abused its discretion in denying discovery and bypassing arbitration.

The judgment of the district court will be affirmed.