TEAMSTERS PENSION TRUST FUND
OF PHILADELPHIA AND VICINITY,
et al., Plaintiffs,

v.

LAIDLAW INDUSTRIES, INC., a
Delaware Corporation, et al.,
Defendants.

Civ. A. No. 86–470 LON.

United States District Court,
D. Delaware.

Aug. 6, 1990.

David C. McBride, Barry M. Willoughby and Timothy J. Snyder, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for plaintiffs.

Lawrence A. Hamermesh and Palmer Whisenant, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Ronald H. Surkin, Andrea B. Wapner and Peter A. Gold, of Blank, Rome, Comisky & McCauley, Philadelphia, Pa., of counsel), for defendants.

## OPINION

LONGOBARDI, Chief Judge.

### I. OVERVIEW

This action was brought by four multiemployer pension funds, for *inter alia*, the collection of withdrawal liability from the Defendant Laidlaw Transportation, Ltd. ("Laidlaw, Ltd.") and all the corporations under common control with Laidlaw, Ltd. (collectively referred to as the "Defendants"). The Plaintiff pension funds are: The New York State Teamsters Conference Pension & Retirement Fund ("New York Fund"), Teamsters Local 641 Pension Fund ("641 Fund"), Health & Welfare & Pension Funds, Freight Drivers Local Union No. 557 ("557 Fund") and the Teamsters Pension Trust Fund of Philadelphia & Vicinity ("Philadelphia Fund") (collectively referred to as the "Funds").[1] Presently before the Court is a motion for summary judgment brought by the Funds on the grounds that, as a matter of law, the Defendants are liable for the withdrawal liability assessed by the Funds under the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381–1461 ("MPPAA")[2]. This withdrawal liability is due according to the Funds because the Defendants (1) failed to request arbitration of the assessment of withdrawal liability made by the Trustees of the Funds and have therefore waived their right to assert any defenses to their default; or, in the alternative, (2) retained ownership of the withdrawing employer or were a part of the controlled group of corporations with the contributing employer on the date of its withdrawal. Also before the Court is the Funds' motion for an order requiring the Defendants to commence interim payments of the assessed withdrawal liability pursuant to 29 U.S.C. § 1399. Docket Item ("D.I.") 59.

### II. FACTUAL BACKGROUND

Laidlaw, Ltd. is a Canadian corporation involved with the trucking industry. Boss Acquisition Corporation ("BAC"), a wholly-owned subsidiary of Laidlaw, Ltd., agreed to purchase Boss–Linco Line, Inc. ("Boss"), an American trucking corporation, pursuant to an agreement dated August 26, 1979 (the "August 26th Agreement").[3] BAC was formed as a holding company to effectuate the purchase.[4] The August 26th Agreement recited that all of the 200 outstanding and issued shares of common capital stock of Boss were owned by Novo Corporation ("Novo"). D.I. 58 at 1. Pursuant to the August 26th Agreement, D.I. 58 at 1, and with the permission of the Interstate Commerce Commission ("ICC"), BAC took temporary operating control of Boss. The purchase could not be consummated under ICC regulations until final ICC approval. In November of 1980, BAC purchased all of the outstanding stock of Boss under a contract that replaced the August 26th Agreement. As a result of this, BAC and the Defendants were, at this

---

1. The Philadelphia Fund, the 641 Fund and the 557 Fund filed this lawsuit on October 10, 1986. The New York Fund was added as a Plaintiff by an amended complaint filed in September of 1987.

2. Withdrawal liability is assessed against MPPAA employers who terminate their participation in or withdraw from multiemployer pension plans. *See Flying Tiger Line v. Teamsters Pension Tr. Fund*, 830 F.2d 1241 (3rd Cir. 1987). MPPAA defines withdrawal liability "as the employer's adjusted 'allocable amount of

unfunded vested benefits.' 29 U.S.C. § 1381(b)(1) (1982)." *Id.* at 1244.

3. BAC was wholly-owned by Laidlaw Transport, Inc. which, in turn, was wholly-owned by Laidlaw Transportation, Ltd.

4. The parties have stipulated that BAC and Laidlaw were under common control as defined by 29 U.S.C. § 1301. *See* Docket Item ("D.I.") 32 and D.I. 58 at 100.

point, an "employer" within the meaning of 29 U.S.C. § 1301(b).[5] The Defendants do not dispute this but argue that they ceased to be a MPPAA employer as of August 19, 1981.

On August 14, 1981, the directors of Boss unanimously adopted a resolution whereby Boss redeemed from BAC 180 of the 200 issued and outstanding Class A shares of Boss. D.I. 58 at 113–114. The consideration for this redemption was a transfer of substantially all of Boss' trucks and rolling stock. *Id.* This consideration was valued at approximately $3,000,000.00. *Id.* The Funds argue that, in reality, the transfer was without consideration because Laidlaw, Ltd. retained ownership of all of Boss' outstanding stock both before and after the transaction. D.I. 57 at 4.

On August 19, 1981, BAC and Owcen, Inc. ("Owcen") agreed that Owcen would purchase from BAC 20 common shares of Boss' capital stock for an aggregate consideration of $3,000,000.00. D.I. 58 at 115.[6] Specifically, only $130,000.00 was to be payable in cash at the closing, $25,000.00 cash was due 15 days after the closing and the remainder was payable pursuant to a promissory note. D.I. 58 at 115–16. Under the Owcen Agreement, the promissory note provided that the balance was to be payable over five years with interest at 13% per annum. D.I. 63A at 10a, 42a. The Owcen Agreement further provided that Owcen "has deposited and pledged and by these presents does hereby deposit and pledge with and doth hereby sell, assign, transfer, convey, mortgage, hypothecate and set over unto BAC all shares of Boss purchased hereunder and all shares issued in replacement therefore." *Id.* at 122. The Funds characterize this as a sale of stock back to BAC from Owcen. The Defendants characterize this language as part of

the pledge agreement whereby Owcen pledged the Boss stock as collateral for payment of the promissory note. At any rate, the Owcen Agreement provided that when Owcen made payment in full, "the pledge shall terminate" and the Boss stock shall be transferred back to Owcen. *Id.* The Owcen Agreement further provided that:

> if the Purchaser commits any act of default under this Agreement, and if such default is not cured [in a timely fashion], then BAC shall have the option, for a period of four months after each such event, in addition to any and all other rights contained herein, to give notice of amendment of this agreement, to the Purchaser. In the event such notice is given, the Purchaser shall retain an interest in the issued shares of Boss as if there were 3,000,000 shares of Boss issued and shares had been acquired by each payment made to BAC by the Purchaser hereunder to purchase shares at the respective price set forth in Schedule A and no further amounts shall be due or owing under the promissory note and in satisfaction thereof the Purchaser shall retransfer the remaining Boss shares to BAC.

*Id.* at 118–119. The Funds characterize this language as an "option" for BAC to reacquire the Boss stock. According to the Funds, BAC's "option" to reacquire the Boss stock makes the Defendants, as a matter of law, part of the controlled group with Boss, notwithstanding the alleged sale of Boss stock to Owcen. D.I. 57 at n. 6. Despite Owcen's failure to pay the $130,-000.00 cash down payment at the settlement, D.I. 58 at 135, and its arrearage on principal and interest by September, 1981, BAC gave no notice of default.[7] As late as

---

5. The Defendants admitted that from the closing of the November, 1980, purchase by BAC of all the outstanding stock of Boss to August 19, 1981, they "continued to dominate and control [Boss] and replaced former directors with [their] officers. Thereafter, the principal executive, financial, and operational officers of [the Defendants] at all times [within this time period] conducted the affairs of [Boss] for the benefit of [the Defendants] by whom they were employed." D.I. 63A at 9a–10a, 42a.

6. Under the terms of the Owcen Agreement, the substantive laws of the State of New York govern and should be applied to the construction and enforcement of the Owcen Agreement. D.I. 58 at 130.

7. The Statement of Loan Balance covers the time period of August 19, 1981, through March 19, 1982. As of the latter date, the account was $133,500.00 in arrears on principal and $9,807.00 in arrears on interest. D.I. 58 at 135.

March 11, 1982, however, payments of principal and interest were being made. The deposition testimony of Halliwell Soule, general counsel to Laidlaw, indicated that the reason why notice of default was not made was because it was believed that Boss might be able to overcome its financial problems. D.I. 63 at 37.

Boss filed for protection under Chapter 11 of the Bankruptcy Code in March of 1982 and thereafter ceased to make contributions to the Funds. The separate Funds sent various notices purportedly notifying the Defendants of their withdrawal liability under MPPAA. The effect of such purported notices is in dispute among the parties.

### 1. *New York Fund*

The New York Fund, by letter dated May 3, 1982, informed Boss that Boss was liable to the New York Fund for withdrawal liability. D.I. 67A at 37. This letter also informed Boss that under MPPAA, Boss "is required to make payment to this Fund within 60 days of the receipt of this letter." *Id.* The letter only recited a lump sum of the assessed amount of withdrawal liability and provided no payment schedule.

On May 6, 1982, the New York Fund also filed a Proof of Claim in the bankruptcy proceedings. D.I. 58 at 185–86. This document does not contain a schedule for withdrawal liability payments nor does it demand payment in accordance with any schedule. The Funds claim that the Defendants also had actual notice of the withdrawal liability because they were involved with the Boss bankruptcy.

### 2. *Philadelphia Fund*

The Philadelphia Fund sent a notice of Assessment of Liability to Boss on March 15, 1983. D.I. 58 at 174. This notice provided, *inter alia,* determinations by the Philadelphia Fund: (1) that Boss had effected a complete withdrawal from the Philadelphia Fund by permanently ceasing contributions, (2) of the total amount of calculated withdrawal liability, (3) of a schedule of quarterly payments, (4) a demand for payments in accordance with the schedule not later than sixty days from the date of the demand, notwithstanding requests for review or any appeals, (5) the date on which the first payment was due, (6) the consequences of a failure to make payments, and (7) that a failure to request review of the determinations within the statutory time periods would result in the plan sponsor's determinations becoming final. *Id.* The Philadelphia Fund's notice to Boss did not contain any determinations that any entity was a member of the Boss controlled group or otherwise liable for Boss' withdrawal. The Defendants contend that since this notice was sent to Boss' business address in Buffalo, New York, and not to the Defendants, this notice was not effective notice under MPPAA as to the Defendants. The Defendants argue that they were not a part of the "controlled group" of Boss as of that date and that they did not receive or have knowledge of this notice.

The Philadelphia Fund also sent a letter to certain of the Defendants dated September 27, 1985, which attached the earlier notice sent to Boss and notified them that they were considered to be part of the controlled group with Boss and subject to the prior notice. D.I. 63A at 54a. While the Philadelphia Fund sent this subsequent notice, it takes the position that this subsequent notice created no new rights in the Defendants and that they were bound by the prior notice to Boss. On November 25, 1985, the Defendants sent a letter to the Philadelphia Fund demanding review of the determinations of liability and the amount thereof. *Id.* at 65a. Also, the Defendants stated that they did not believe they were under common control with Boss anytime after August 19, 1981, the date of the Owcen Agreement. The Defendants claim that this request for review was well within the statutory period. D.I. 63 at 12–13. On December 19, 1985, the Philadelphia Fund requested that the Defendants provide additional information to enable it to consider the request for review.[8] The De-

---

**8.** This request for additional information also

pointed out to the Defendants that "Under the

fendants responded to this request on January 17, 1986. *Id.* at 70a. The Philadelphia Fund affirmed its position that the Defendants were responsible for Boss' withdrawal liability on December 30, 1986. *Id.* at 72a. The Defendants requested arbitration of the Philadelphia Fund's determination on February 26, 1987. *Id.* at 77a.[9] The record does not reveal any response from the Philadelphia Fund to this request.

### 3. *641 Fund*

Boss was initially notified of the 641 Fund's determination of withdrawal liability by notification dated July 23, 1982. D.I. 67A at 25. On August 3, 1982, it notified Boss of its delinquency in interim payments. *Id.* at 28. The July 23rd notice determined: (1) that Boss was subject to withdrawal liability; (2) the amount of liability; (3) the amount of monthly installments due; (4) the date such monthly installments were to begin; (5) a demand for payment in accordance with the installment schedule; (6) Boss' right to request review; (7) that such payments were to be paid regardless of challenges; (8) the consequences of a failure to make payment; (9) the right to request arbitration in accordance with MPPAA; (10) the potential that other entities under common control with Boss could also be liable; and (11) the need to adhere to MPPAA's time periods for dispute resolution. D.I. 67A at 25–26.

Boss, BAC and other Laidlaw subsidiary companies were sent an Assessment of Liability notice dated April 1, 1986. D.I. 58 at 183. On April 18, 1986, counsel for BAC and other Defendants submitted a Request for Review. D.I. 63A at 51a. In this letter, it was contended that neither BAC nor its related companies were members of the Boss control group and were not under common control with Boss after August 19, 1981. *Id.* The record contains no response

from the 641 Fund to the request for review.

### 4. *557 Fund*

On October 10, 1983, the 557 Fund advised Boss of its withdrawal liability. D.I. 67A at 34. This Assessment of Liability was addressed to Boss at its New York office. The notice contained, *inter alia*, determinations by the 557 Fund: (1) that Boss ceased its obligation to contribute to the 557 Fund; (2) of its computed withdrawal liability; (3) that the 557 Fund is a trucking industry fund under ERISA and, in accordance therewith, that Boss is to furnish a bond or escrow of 50% of the amount of the withdrawal liability; (4) that the result of failing to timely furnish the bond or escrow will result in a determination that Boss effected a complete withdrawal from the 557 Fund and that withdrawal liability payments would then be due in accordance with the provided schedule of payments; (5) that Boss had a right to seek review; and (6) that the 557 Fund was filing a proof of claim in the bankruptcy court on the withdrawal liability. The 557 Fund sent its Assessment of Liability notice to the Defendants by notice dated June 27, 1986. D.I. 58 at 181. By letter dated July 11, 1986, the Defendants notified the 557 Fund of their request for review. D.I. 63A at 53a. The record contains no response to this letter.

## III. DISCUSSION

### 1. *Summary Judgment Standards*

This matter is before the Court on motion by the Funds for summary judgment. The familiar standards on such a motion require this Court to grant summary judgment in favor of the Funds only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

---

law, payments are due notwithstanding a request for review. See 29 U.S.C. § 1399(c)(2). As no payments have been made, the Companies are, assuming liability, in default and liable for the entire amortized withdrawal liability ... with interest under 29 C.F.R. § 2644.3...." D.I. 63A at 69a.

**9.** In this request for arbitration, the Defendants alternatively argued that the issues addressed in the Philadelphia Fund's December 30, 1986, determination, D.I. 63A at 72a, were not subject to MPPAA review and arbitration procedures and should be resolved in the course of litigation. *Id.* at 77a.

Those facts which are material are necessarily defined by the substantive law governing the issues and only disputes over such factual matters will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Once a properly supported motion for summary judgment is presented, the party opposing summary judgment must come forward with sufficient evidence of a dispute of material fact requiring resolution by the trier of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Of course, in determining a motion for summary judgment, the Court must view the facts and all reasonably derived inferences most favorably to the nonmoving party. *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Hersh v. Allen Products Co., Inc.*, 789 F.2d 230, 232 (3rd Cir.1986).

## 2. *Arguments of the Parties*

The Funds assert two bases upon which they argue summary judgment in their favor is appropriate. First, they contend that the Defendants failed to request arbitration of the assessment of withdrawal liability as required by MPPAA and the Defendants are therefore foreclosed from contesting such liability. D.I. 57 at 12. The Funds rely on their notices directed to Boss in 1982 and 1983. They argue that the subsequent notices sent to the Defendants in 1985 and 1986 created no additional rights for the Defendants. *See* D.I. 67 at n. 6. The Defendants argue that they have not waived defenses to the Funds' assessments of withdrawal liability. This argument is based on various asserted technical deficiencies in the notices provided and that, as a result of the Owcen Agreement, they ceased to be a member of the Boss controlled group prior to the time of Boss' withdrawal. Second, the Funds contend that the Defendants were a part of Boss' control group at the time of the Boss withdrawal. *Id.* at 13. This argument is based

on the Funds' characterization of the Owcen Agreement and, in particular, the language describing the "pledge" and remedies for its default. The Defendants argue that, as a result of the Owcen Agreement, they ceased to be a member of the Boss control group. They argue that the Owcen Agreement was simply a sale of the Boss stock to Owcen with the Boss stock pledged as security for the payment of the purchase price.

### (a) Failure to Arbitrate

■ Section 1401(b) of MPPAA provides that "[i]f no arbitration proceeding has been initiated ..., the amounts demanded by the plan sponsor ... shall be due and owing on the schedule set forth by the plan sponsor. The plan sponsor may bring an action in a State or Federal court of competent jurisdiction for collection." 29 U.S.C. § 1401(b)(1). There has been a great deal of judicial discussion on the priority of arbitration to resolve withdrawal liability disputes and the consequences for failing to arbitrate certain matters. *See generally,* S. Kenkel, *ERISA The Supremacy of Arbitration in the Multiemployer Pension Plan Amendments Act of 1980*, 56 Geo. Wash.L.Rev. 815 (1988).

In *IUE AFL–CIO Pension Fund v. Barker & Williamson*, 788 F.2d 118 (3rd Cir.1986), the plan sponsor notified B & W, the withdrawing employer, of its withdrawal liability. B & W failed to make its first quarterly payment and the fund eventually brought a claim against B & W to recover the withdrawal liability. The District Court permitted the fund to amend its complaint to add Sentinel, an entity that was alleged to have transacted into MPPAA employer status.[10] The fund moved for summary judgment against B & W and Sentinel on the theory that, by failing to respond to the original demand for payment, both of these entities waived their right to contest the demand. *Barker & Williamson*, 788 F.2d at 121. The Third Circuit concluded that under MPPAA, no-

---

**10.** The District Court found that Sentinel "either owned or had an option on all of B & W's shares" at the time that B & W, a MPPAA

employer, terminated its operations. *Barker & Williamson,* 788 F.2d at 123.

tice to one member of the control group of the withdrawing employer serves as constructive notice to all those subsequently deemed to be members of that controlled group. *Id.* at 127. The court also concluded that Sentinel was part of the control group with B & W. *Id.* at 125. Thus, the notice to B & W was effective as to Sentinel. Since Sentinel failed to request review of that liability or initiate arbitration in a timely fashion under section 1401(b), the court held that "Sentinel will be deemed to have waived these statutory rights and defaulted under section 1399(c)(5)." *Id.* at 130.

In *Flying Tiger Line v. Teamsters Pension Tr. Fund,* 830 F.2d 1241 (3rd Cir. 1987), Flying Tiger sought declaratory and injunctive relief in federal court one day after it had requested review by the multiemployer pension fund on the issue of whether it was an employer under MPPAA. Flying Tiger argued that the sale of its shares of stock in the withdrawing employer prior to the employer's withdrawal terminated its status as a member of the controlled group. Flying Tiger further argued that since MPPAA section 1401 refers to disputes between employers and plan sponsors, it had to be judicially determined whether it was an employer before it could be compelled to arbitrate. The Third Circuit concluded that the resolution of whether Flying Tiger would be subject to withdrawal liability necessarily raised the issue of whether or not Flying Tiger's sale of Hall's stock to HAC in January, 1985, was a sham transaction designed to relieve Flying Tiger of Hall's withdrawal liability and therefor appropriately ignored under MPPAA's "evade or avoid" provision. *Flying Tiger Line,* 830 F.2d at 1247.[11]

While no provision of MPPAA specifically addresses who should resolve questions concerning the status of a one-time employer, the statutory scheme specifically provides that once an entity is an employer, it will be deemed to have withdrawn when it "permanently ceases to have an obligation to contribute under the plan." 29 U.S.C. § 1383(a) (1982). Any such employer will, under MPPAA section 1381, be assessed withdrawal liability unless that employer satisfies a statutory provision relieving it of liability.

*Id.* at 1250; *see also Banner Indus. v. Central States Pension Fund,* 657 F.Supp. 875, 882–83, *issues certified for appeal,* 663 F.Supp. 1290, *subsequent opinion,* 663 F.Supp. 1292 (N.D.Ill.1987) (the Third Circuit expressly found this distinction raised in *Banner Indus.* to be "persuasive." *Flying Tiger Line,* 830 F.2d at 1251).[12] The court affirmed the District Court's decision to stay the proceedings pending arbitration of the issue.

In *Flying Tiger Line,* the Third Circuit distinguished *Barker & Williamson* as a case where the court "was required to interpret MPPAA section 1301 to determine whether ... the putative controlled group member [(Sentinel)] had *become* such an employer 'at the time' ... the contributing employer[] completely withdrew from its multiemployer pension plan." *Id.* at 1249 (emphasis in original). The Third Circuit said that the use of a declaratory relief action was limited to those disputes concerning matters outside of MPPAA sections 1381 to 1399. *Id.* at 1250. *Barker & Williamson* "does not undermine section 1401's clear mandate that disputes within that range of sections be arbitrated." *Id.* The issue in *Flying Tiger Line* was

---

**11.** In that case, Flying Tiger brought suit seeking, *inter alia,* a declaration that it was not liable for Hall's withdrawal liability because, as a result of Flying Tiger's sale of 75% of Hall's stock to HAC, Hall's was no longer a part of the Flying Tiger controlled group. *Flying Tiger Line,* 830 F.2d at 1246. In the instant matter, the Defendants did not bring a declaratory action or seek an injunction. Rather, the Funds brought this action to compel the payment of withdrawal liability.

**12.** In *Flying Tiger Line,* Flying Tiger had filed for declaratory and injunctive relief one day after it had requested review of the determination of withdrawal liability from the fund based on the evade or avoid issue. *Flying Tiger Line,* 830 F.2d at 1245–46. The court stayed the proceedings pending arbitration of the issue.

"whether Tiger ceased to be a MPPAA employer in time to avoid liability for Hall's withdrawal." *Id.*

*I.A.M. Nat. Pension Fund v. Clinton Engines Corp.*, 825 F.2d 415 (D.C.Cir.1987) involved two separate cases. In the first, the District Court concluded that the employer had failed to initiate arbitration and was therefore not entitled to dispute the existence or amount of its withdrawal liability. *Id.* at 419. The employer appealed arguing that because its defense involved a pure legal issue of statutory interpretation, it could refuse to make interim payments, bypass arbitration and raise its defenses in the collection suit brought by the plan sponsor. *Id.* In the second case, the District Court reached the employer's defenses, even though the employer failed to initiate arbitration, and ruled in the employer's favor. *Id.* at 421. In the latter case, the District Court reached the merits of the employer's defenses because it concluded that the issues involved were of statutory interpretation.

The District of Columbia Circuit addressed the issue of "whether an employer that has been assessed 'withdrawal liability' within the meaning of MPPAA must arbitrate its asserted defenses to liability in order to preserve those defenses for ultimate judicial consideration." *Clinton Engines*, 825 F.2d at 416. The court answered this issue stating that:

> On the basis of Congress' clearly expressed intent, we conclude that the employers in these cases were bound initially to resort to arbitration. Having failed to do so, the employers have thereby waived these defenses and cannot raise them in actions brought by the pension plan sponsor to collect amounts owed by virtue of withdrawal liability.

*Id.* Neither of the employers disputed that the defenses to withdrawal liability "concern[ed] a determination made under sections 1381 through 1399." *Id.* at 422. The court said it was therefore clear that the employers "seek to avoid the result of section 1401(b)(1), which clearly bars defenses to resist paying 'the amounts demanded.'" *Id.* at 422–23. The Court continued, stating that "in allowing the statutory period for initiating arbitration to expire, [the employers] were flying in the teeth of statutory language clearly indicating that the result of this inaction could very well be maturation of the amount claimed by the Fund into a presently owing debt." *Id.* at 424. The court also recognized the hardship presented by losing the opportunity to present defenses, especially when one of the employers had prevailed on the merits in the District Court. *Id.* at 427. However, the court said this hardship would not work an inequity because the employer's wounds were self-inflicted. *Id.*

In *Teamsters Pension Trust Fund v. Allyn Transp. Co.*, 832 F.2d 502 (9th Cir. 1987), the fund sent notice of withdrawal liability and demand for payment to Allyn. Allyn requested reconsideration of the determination, which was rejected by the fund. Allyn did not initiate arbitration and the fund sued to collect the withdrawal liability. Summary judgment was entered against Allyn because Allyn had failed to timely initiate arbitration. *Allyn Transp.*, 832 F.2d at 504. In affirming the summary judgment the Ninth Circuit found, *inter alia*, that MPPAA afforded Allyn a due process hearing before an arbitrator and, if necessary, before a court. Allyn failed to exercise its right to arbitration. Thus, the court concluded that MPPAA does not deny a due process hearing. *Id.* at 506.

The court also affirmed summary judgment against the Landy corporations for the amount of the judgment against Allyn on the theory that the Landy corporations were under common control with Allyn and therefore jointly and severally liable for Allyn's withdrawal liability. *Allyn Transp.*, 832 F.2d at 506–07. The Ninth Circuit, relying on *Barker & Williamson*, found that the direct notice to Allyn sufficed as constructive notice to the Landy corporation. *Id.* Because the Landy corporation failed to initiate arbitration within the statutory time periods, it too was responsible for the amount of the withdrawal liability. Furthermore, the court concluded that the failure to provide individual notice to the Landy corporations did not deprive them of due process because "the require-

ment of common control ... assures that ... entities who may ultimately be held liable for withdrawal liability in fact have notice and an opportunity to contest the existence and extent of that liability." *Id.* at 507, *quoting Teamsters Pension Fund v. H.F. Johnson, Inc.*, 830 F.2d 1009, 1013 (9th Cir.1987).

Several other cases have similarly concluded that the failure to timely initiate arbitration will result in a waiver of the right to assert defenses to withdrawal liability arising under sections of MPPAA clearly designated for arbitration.[13] *See, e.g., Robbins v. Chipman Trucking Inc.*, 693 F.Supp. 628, 635 (N.D.Ill.1986)[14] (adopting the rule "that by failing to seek arbitration, a party forfeits its opportunity to raise defenses to the existence or amount of its withdrawal liability, even a defense based solely on statutory interpretation."); *Robbins v. Chipman Trucking Inc.*, 1987 WL 13571, 1987 U.S.Dist. LEXIS 6208 (N.D.Ill.1987) (failure to initiate arbitration within statutory time periods results in waiver of right to have an arbitrator decide the question of waiver; also stating that under the previous opinion, "[o]nce the federal court finds that the employer has waived his right to contest the withdrawal amount in arbitration, the employer loses. We believe this was the intention of the MPPAA framers. To give the employer one chance to contest withdrawal liability and to give that chance in the arbitral setting."); *Bowers v. Compania Peruana De Vapores, S.A.*, 689 F.Supp. 215, 219 (S.D.N.Y.1988) (recognizing, in dicta, that failure to initiate arbitration results in waiver of defenses, *citing*

*Clinton Engines* ); *In re Metro Transp. Co.*, 82 B.R. 351 (Bkrtcy E.D.Pa.1988) (failure to request review of fund's withdrawal liability or to initiate arbitration of assessment made fund's assessment and payment schedule final); *Banner Indus. v. Central States Pension Fund*, 657 F.Supp. 875, 884 (N.D.Ill.1987) (recognizing rule that "failure to initiate arbitration within [statutory] time limits constitutes a waiver of the opportunity to do so" however, in that case, the alleged employer's filing of declaratory action tolled the statutory time frames), *aff'd*, 875 F.2d 1285 (7th Cir.), *cert. denied*, ── U.S. ──, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989); *Philadelphia Journal, Inc. v. Teamsters Pension Trust Fund of Philadelphia & Vicinity*, 1989 WL 45865, 1989 U.S.Dist. LEXIS 4727 (E.D.Pa.1989) (failure to initiate arbitration or obtain an extension of time results in full amount of withdrawal liability becoming due and owing).[15]

Applied to the instant matter, it is clear that the issue of whether or not the Owcen Agreement had, as a principal purpose, the evasion or avoidance of withdrawal liability is an issue that arises under section 1392. It is equally clear that section 1392 is within those sections that Congress has mandated be arbitrated. 29 U.S.C. § 1401(a)(1); *see also Flying Tiger Line*, 830 F.2d at 1248. The failure to timely initiate arbitration of those disputes under sections clearly earmarked for arbitration will result in a waiver of the right to assert the defense. In this case, the Defendants have waived their right to assert that the Owcen Agreement did not constitute an evade or avoid

---

13. *See also* R. Cooke, ERISA Practice and Procedure § 7.48 at 7–145–146 (1989).

14. This case also cited several cases in which the court decided that "exhaustion of the arbitration remedy is not an absolute bar, but rather is a prudential matter within the court's discretion." *Chipman Trucking*, 693 F.Supp. at 633. The court distinguished these cases in the following ways: some of the cases involved situations in which arbitration was still available, which meant that the question was whether to refer the case back to arbitration, not the waiver issue, *id.;* other cases involved situations in which the alleged employer brought declaratory relief actions, thereby tolling the running of the

time period, *id.* at 634; others involved facial challenges to the constitutionality of MPPAA, *id.;* and still other cases involved questions of law or statutory interpretation, *id.*

15. The Defendants argue that they cannot be held to have waived their rights to assert defenses because to do so would run counter to due process in that it would make final the determinations of inherently biased pension plan trustees. *See* D.I. 63 at 21–22. MPPAA does provide for due process, *see infra* at 1023–24 (discussion of *Allyn Transp.* which the Court adopts for purposes of this case) and the Defendants could have availed themselves of those rights.

transaction. As a result, the Owcen Agreement must be disregarded and the withdrawal liability provisions shall be applied. 29 U.S.C. § 1392(c). The notices sent to Boss by the various Funds serve as constructive notice to the Defendants of withdrawal liability. *See Barker & Williamson*, 788 F.2d at 127. As a consequence of this, this Court finds that the Defendants are jointly and severally liable with Boss for Boss' withdrawal liability.

The Court is persuaded that the statutory scheme of MPPAA envisions this result. Congress intended to protect the multiemployer pension plans from withdrawals aimed at evading or avoiding an employer's responsibility to such plans. *See, e.g.,* 126 Cong.Rec. H23038 (daily ed. Aug. 25, 1980) (Remarks of Rep. Thompson, Dem., N.J., principal House sponsor of MPPAA). The time for controlled group members to avoid that responsibility is at the time they transact with third parties.

Once an employer is within a controlled group, the responsibility of lawfully avoiding withdrawal liability lies within the power of that entity. This is not to suggest that once in, the entity is forever bound to controlled group status. Obviously, there are legitimate transactions involving sales of assets or sales of controlling stock that will, after contest, not be deemed evade or avoid transactions. The obligation, however, rests not with the Funds but with the employers and members of the controlled group because it cannot be contemplated that contracts between a controlled group member and third parties will negate the obligation Congress deemed necessary to maintain the integrity of multiemployer pension plans. This is an overriding concern that can be carried out only by forcing the member of the controlled group wanting to sell assets or stock to assume the responsibility of shedding that obligation in a lawful way. Part of that is recognizing the threat of continuing liability and then by contract or otherwise providing suitable means to cover the risk. Escrow accounts, surety bonds, notice provisions, purchase price set asides, all of these things and more diminish the risk. But, in the final analysis, liability once assumed cannot be so easily shed as by entering a contract and leaving the scene. The statute contemplates more. It gives notice of such and contracting parties are required to protect against such liability.

Although not pertinent to the present situation, look, for instance, at section 1384. It provides employers the means to eventually relieve themselves from contribution responsibilities in sale of assets situations. These are all common sense approaches that could have been utilized to protect the Defendants from the continuing risk of withdrawal liability exposure or even the complaint that they received no notice of liability. The point is that, as members of a controlled group, their responsibility continues until, by agreement or by arbitration, their transaction is deemed not one designed to avoid or evade their pension contribution obligations. MPPAA employers have a continuing obligation to provide for withdrawal liability and run the continuing risk that a multiemployer pension fund will assert withdrawal liability against it.

Furthermore, if the time limits for arbitration are to have any meaning or effect, the failure to initiate arbitration must result in a waiver of the rights associated with arbitration. Otherwise, the arbitration provisions are merely window dressing to be utilized as the parties see fit. If the putative employer were able to litigate arbitration mandated matters in section 1401(b)(1) collection actions, there would be no incentive, indeed there would be no need, to arbitrate such matters. Where arbitration mandated matters have been arbitrated and the arbitrator has reached a decision, MPPAA section 1401(b)(2) provides a mechanism whereby either party may bring an action "to enforce, vacate, or modify the arbitrator's award." This plain reading of the statute clearly envisions the mandatory aspects of arbitration and the result reached by this Court.

■ The Defendants assert that the May 3rd notice sent to Boss by the New York Fund is entirely deficient because, *inter alia,* it failed to set forth the schedule of

payments and a demand for payments in accordance with such schedule. Furthermore, they argue that the notice did not make a specific determination that the Defendants were liable for Boss' withdrawal liability and the notice was not sent to the Defendants. These arguments must be rejected for several reasons. This Court's determination that the Defendants waived their right to argue that the Owcen Agreement was not an evade or avoid transaction results in the conclusion that the Defendants never ceased to be a part of the Boss control group. From this conclusion it follows that the notice to Boss served as constructive notice to the Defendants of their withdrawal liability. *See Barker & Williamson*, 788 F.2d at 126–27.

Having established that the notice to Boss served as constructive notice to the Defendants, the Defendants' arguments with regard to the notices' content must also be rejected. The May 3rd notice to Boss stated that there was a withdrawal liability in a certain amount which was due and owing within a certain time period. When confronted with such an assessment of withdrawal liability, the employer who chooses to ignore it must be prepared to take the risk of that liability becoming due and owing. Certainly the employer and members of the controlled group could have contested with the New York Fund its determination of withdrawal liability. MPPAA provides as much. Indeed, the Defendants could have challenged the content adequacy of that notice.[16]

### (b) Equitable Considerations

■ With regard to the notices sent to Boss by the remaining Funds, the Defendants assert various equitable reasons which would allow the Defendants to present their defenses to the Funds' assertion of liability. As to the Philadelphia Fund, the 641 Fund and the 557 Fund, the Defendants argue that during the time the arbitration initiation period was running against the Defendants, "Third Circuit law appeared to indicate that the 'evade or

avoid' issue, and the issue of [the Defendants'] 'employer' status, was for a court, not an arbitrator, to decide." D.I. 63 at 17 (discussing *Dorn's Trans. v. Teamsters Pension Trust Fund*, 787 F.2d 897 (3rd Cir.1986); *Barker & Williamson*, 788 F.2d 118; *Flying Tiger Line*, 830 F.2d 1241). They also assert as evidence of this uncertainty that the Funds, in the complaint, sought judicial review of the Owcen Agreement to determine whether one of its principal purposes was to evade or avoid withdrawal liability. *Id.* at 19. Furthermore, they argue that the time period for initiating arbitration should be tolled because even after the District Court decision in *Flying Tiger Line*, the Funds continued to litigate the evade or avoid issue. *Id.* The Defendants argue this is not a case where they slept on their rights; rather, they argue they responded to every notice they actually "received" and thereafter operated under the assumption that the court was the proper forum to decide the dispute. *Id.* at 20.

Equitable tolling of the arbitration initiation time period may generally be appropriate if "(1) the [Funds have] actively misled the [Defendants] respecting the cause of action, (2) the [Defendants have] in some extraordinary way been prevented from asserting [their] rights, or (3) the [Defendants have] raised the precise statutory claim in issue but [have] mistakenly done so in the wrong forum." *School Dist. of City of Allentown v. Marshall*, 657 F.2d 16, 20 (3rd Cir.1981), *quoting Smith v. American President Lines, Ltd.*, 571 F.2d 102, 109 (2d Cir.1978). "The restrictions on equitable tolling ... must be scrupulously observed." *City of Allentown*, 657 F.2d at 19; *see also Williams v. Army and Air Force Exchange Service*, 830 F.2d 27, 30 (3rd Cir.1987).

Under different circumstances, equitable tolling has been utilized under MPPAA. *See Republic Industries v. Teamsters Joint Counsel*, 718 F.2d 628, 644 (4th Cir. 1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct.

---

**16.** The record reveals that Boss did just that. *See* D.I. 67A at 41.

3553, 82 L.Ed.2d 855 (1984);[17] *Banner Indus.*, 657 F.Supp. at 884.[18] In this case, the Funds have neither actively nor passively misled the Defendants with regard to the cause of action. The Funds gave notice of withdrawal liability to the withdrawing employer. This, as we have seen, served as constructive notice to the Defendants. *Barker & Williamson* recognizes that such notice is all that is required. There is no evidence that the Funds misled the Defendants into believing that the Defendants could not seek arbitration.[19] It cannot seriously be contended that the Defendants were prevented from asserting their rights to arbitration. This is not a case where the employer demanded arbitration and the MPPAA pension fund refused to allow arbitration or impeded the employer from initiating arbitration in any way. *Cf. I.A.M. Nat. Pension Fund Ben. v. Stockton Tri Ind.*, 727 F.2d 1204 (D.C.Cir.1984) (in *Stockton*, the pension plan demanded withdrawal payments and then refused to arbitrate, notwithstanding the fact that the arbitration time period had not yet expired). Rather, the Defendants did nothing in response to the constructive notices of the Funds.[20] The Defendants' reliance on *Dorn's Transportation* is misplaced not only because that case was an extraordinary one[21] but also because in that case the employer took affirmative action by filing a declaratory relief action. Furthermore, reliance on *Barker & Williamson* is misplaced. As previously discussed, that case involved a different issue: whether Sentinel had transacted into MPPAA employer status in time to incur withdrawal liability. Thus, that case was more similar to *Banner Industries* because it addressed not only whether arbitration was proper but whether it was possible at all. In this case, as we have seen, there is no question that the Defendants were, at one time, MPPAA employers within Boss' control group.[22] The Defendants' argument that the law was uncertain as to the arbitration requirements carries less weight in light of

17. The Circuit Court decided it to be "equitable that when [the employer] has made a not frivolous challenge to the constitutionality of the arbitration procedures, the validity of which has not heretofore been definitively decided, the pendency of the litigation should toll the running of the period prescribed in § 1401(a)(1)(B)." *Republic Industries*, 718 F.2d at 644.

18. The court said that equitable tolling may be appropriate where:

[T]he issue is the constitutionality of the statutory provisions providing the arbitrator with his authority.... [In such cases] equity dictates that the time period for initiating arbitration be tolled until a determination is made that the arbitration is not only proper but *possible.* Similarly, if the issue is whether or not one of the parties falls within the arbitrator's jurisdiction ... the same considerations of fairness dictate that the time for pursuing arbitration be tolled until a determination is made that the party is subject to the mandatory arbitration provisions.

*Banner Indus.*, 657 F.Supp. at 885 (emphasis in original). The court decided that tolling was appropriate because the issue raised in Banner's declaratory relief action was one that had not yet been definitively decided. *Id.* The court was also moved by the affirmative action taken by Banner in filing its lawsuit. *Id.* at 884–85.

19. Even if it is accepted that the Funds continued to litigate the evade or avoid issue in federal court, *see* D.I. 63 at 19, this is not akin to actively misleading the Defendants as to the need to arbitrate such issue. Surely the Defendants do not seek to rely on the litigation strategies of the Funds, whatever they may be, as a basis for failing to initiate arbitration timely.

20. While the record reveals that the Defendants did make certain responses to the notifications the various Funds sent directly to the Defendants, this action was too little too late.

21. In *C. Colteryahn Dairy v. Teamsters & Emp. Pension F.*, 847 F.2d 113, 123–24 n. 17 (3rd Cir.1988), *cert. denied*, 488 U.S. 1041, 109 S.Ct. 865, 102 L.Ed.2d 989 (1989), the Third Circuit distinguished *Dorn's Transportation* as a "rare case" that required no need for development of a factual record. The court said that the decision to reach the merits of the MPPAA dispute in *Dorn's Transportation* was not an abuse of discretion. However, it "did not purport to set forth a black letter rule...." *Id.* In that same footnote, the court reiterated its view that "the mandate of § 1401 is mandatory." *Id.*

22. Similarly, the Defendants' reliance on *Refined Sugars v. Loc. 807 Labor–Manage. Pens. Fund*, 580 F.Supp. 1457 (S.D.N.Y.1984) is misplaced. In that case, the employer sought declaratory and injunctive relief. Furthermore, that case involved a facial challenge to the constitutionality of MPPAA as well as a statutory challenge and the issue of whether the plaintiff was subject to MPPAA at all.

the clear statutory mandate regarding arbitration. *See* 29 U.S.C. § 1401. The Defendants did not raise the claim by bringing a declaratory relief action in federal court. Rather, the Defendants waited until the Funds brought suit for collection.

█ The Defendants next assert that the Court must decide whether the Funds have waived their right to contend that arbitration is the proper forum for this case. D.I. 63 at 23–25. The Defendants assert that the Funds failed to initiate arbitration and never suggested that arbitration was a requirement until some 18 months into this lawsuit. This argument must be rejected because there was no duty on the Funds to initiate arbitration. Section 1401 allows either the employer or the plan sponsor to initiate arbitration. 29 U.S.C. § 1401(a)(1). Indeed, there was no reason for the Fund to initiate arbitration in this case because section 1401(b)(1) provides the Funds with a collection action where no arbitration has been initiated.[23]

█ Additionally, the Defendants assert that because the 557 Fund and the 641 Fund filed this action before the time for arbitration initiation expired, these Funds have elected the courts as their remedy and cannot now assert an arbitration requirement. D.I. 63 at 25. The Defendants rely on notices actually "received" by them and not on the early notices sent to Boss. This argument must also be rejected because this Court has already determined that the Defendants were bound by the early notices sent to Boss. Thus, the Funds did not file this lawsuit within the time when arbitration had to be initiated. There is no evidence in the record that the Defendants responded to these notices. As to the Philadelphia Fund, the Defendants assert that such Fund waived its right to contend arbitration is the proper forum because it responded to the Defendants' request for review, then filed this lawsuit and then failed to respond to the Defendants' request to initiate arbitration. D.I. 63 at 27.[24] Once again, the Defendants' argument must be rejected because it is based on the subsequent notice and not on the early notice sent to Boss which this Court has held was effective as to the Defendants.

The Defendants argue that the Funds failure to timely raise the arbitration requirement means that arbitration may be excused. *See* D.I. 63 at 24–25, *citing Clinton Engines*, 825 F.2d at 422. The Defendants once again miss the point. The Funds are not seeking to move this case into to arbitration; rather, the Funds are contending that arbitration was the statutorily mandated method for resolving the issues raised by the Defendants and that the failure to arbitrate resulted in a waiver.

The Defendants argue that neither the statute nor any Third Circuit decision states that failure to timely demand arbitration results in a conclusion that an employer "irretrievably" waives its right to assert in some forum its status as a member of the controlled group. *See* D.I. 63 at 29. This Court's consideration of the equities in this case, of course, refutes any contention of revocable waiver.

#### (c) Interim Payments

In their motion for interim payments, the Funds seeks an "order directing [d]efendants to make interim payments under 29 U.S.C. § 1399(c)(2) pending the outcome of their Motion for Summary Judgment...." D.I. 59 at 3–4. Because the Court has decided the summary judgment motion in favor of the Funds, the interim payments motion is now moot. The Defendants are jointly and severally liable for the withdrawal liability of Boss. That amount, pur-

---

**23.** The Defendants assertion that this action was more than a collection action is of no moment. The Funds did seek collection of withdrawal liability which was in default.

**24.** The Defendants rely on the September 27, 1985, notice sent by the Philadelphia Fund to the Defendants. D.I. 63A at 54a. They also rely on the November 25, 1985, request for review. *Id.* at 65a. On December 19, 1985, the Philadel-

phia Fund requested that the Defendants supply additional information, *id.* at 67a, to which the Defendants responded on January 17, 1986, *id.* at 70a. The Defendants requested arbitration on February 26, 1987. The Defendants contend that this request was timely because it was less than 60 days after the Philadelphia Fund responded to the Defendants' request for review.

suant to MPPAA section 1401(a)(1), is now due and owing. *See Barker & Williamson*, 788 F.2d at 130; *see also Robbins v. Admiral Merchants Motor Freight, Inc.*, 846 F.2d 1054, 1056–57 (7th Cir.1988) ("[f]ailure to initiate arbitration has a simple result—the amount demanded by the pension plan sponsor becomes due and owing").

## IV. CONCLUSION

The Funds' motion for summary judgment is granted. The Court has determined that the Defendants have waived their right to assert defenses arising under MPPAA sections 1381 through 1399. As a result, the Defendants are foreclosed from arguing that they removed themselves from the Boss controlled group. Accordingly, the Defendants are jointly and severally liable for the withdrawal liability of Boss. There is no need to consider the Funds' alternative ground for summary judgment.